## NATIONAL LABOR RELATIONS BOARD v. ALADDIN INDUSTRIES, Inc.

No. 7670.

Circuit Court of Appeals, Seventh Circuit.

Jan. 16, 1942.

Rehearing Denied Feb. 19, 1942.

378

SPARKS, Circuit Judge, dissenting in part.

———◆———

Robert B. Watts, NLRB, of Washington, D. C., I. S. Dorfman, NLRB, of Chicago, Ill., and Mortimer Kollender, NLRB, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Sylvester Garrett, and William Stix, all of Washington, D. C., for petitioner.

W. H. F. Millar, of Waynesville, N. C., and C. O. Davisson, of Anderson, Ind., for respondent.

Before EVANS, SPARKS, and MINTON, Circuit Judges.

EVANS, Circuit Judge.

Since 1927, respondent has been operating a factory in Alexandria, Indiana, where it makes kerosene lamp bowls, lamp chimneys, incandescent mantles, shades, vacuum bottles, electric lamps, etc., and has employed an increasing number of men and women to turn out its products, which are shipped to all parts of the United States. Thus engaged in interstate commerce, respondent and its employees admittedly came within the provisions of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. A dispute between it and its employees arose, which called for action by the National Labor Relations Board. Out of that dispute came a complaint by the Board against respondent, upon which a hearing was had in 1937. This hearing and the order which the Board entered, and respondent's action thereon, provoked this petition by the Board for the enforcement of its order.

The report, findings, and order, together, form a rather lengthy document, too voluminous to be set forth in extenso. In substance, the Board found that respondent interfered with, restrained, and coerced its employees' joining or maintaining membership in United Automobile Workers of America. This finding was based on respondent's action (a) in questioning its employees concerning their union activity; (b) in seeking to establish an independent union in opposition to the Union; (c) in circularizing its employees with a letter attacking the Union.

It also found that respondent violated Section 8(3) and (1) of the Act by discriminatorily refusing to reinstate ten union members following a strike, thereby discouraging membership in the Union.

The Board entered an order directing respondent to cease and desist from these unfair labor practices, to reinstate the ten employees with back pay, and to post appropriate notices of the order in its plant.

Respondent attacks the findings as being without evidentiary support, and the Board's order as being without the support of evidence or valid findings, and beyond the scope of the Union's charge and the Board's complaint. Upon the conclusion of the trial lasting about six weeks, the Examiner, in a preliminary report, found generally against the respondent.

In some aspects of the case, it is not unlike others we have heard, where the employer's early antagonism to unions, embarrassed it in later controversies wherein it relied on an asserted strict neutrality.

Respondent, throughout its early history, was strongly anti-labor union. Its attitude was bitter. Readily and eagerly it accepted the opinion of a group of lawyers who, in 1936, declared the Labor Relations Act was unconstitutional. It ignored and refused to follow the provisions of this Act. At this trial it was embarrassed by this early anti-union attitude, and its early insistence upon a so-called "yellow dog" contract with its employees which, by the way, it long ago abandoned.

Although respondent, after it learned that the N. L. R. Act was constitutional, changed its attitude completely and adopted a new employer-employee relationship policy, nevertheless its action was properly studied and interpreted by the Examiner and by the Board in the light of its earlier hostile anti-union attitude.

Respondent, with much propriety, asks us to pass judgment, not upon its past

history, action, or attitude, but upon the charges which the Board preferred, and which deal with its later action. Such action was in the year 1937 beginning with and following a sit down strike by its employees.

There is little need for discussing what took place before that time other than to observe that at one time the employer deliberately, intentionally, and constantly violated the rights of the employee, as those rights are defined by the subsequently enacted National Labor Relations Act. Our study, however, is directed to, and our discussion is directed to, what took place in the Fall of 1936 and in the year 1937, during which time there was an election, a strike, a settlement of the strike, followed by collective bargaining, an agreement between respondent and its employees, a second strike, wherein the employees engaged in a sit down strike, a refusal of the strikers to obey an order of a court, and the discharge of strikers by respondent. Following this strenuous life, peace came,—in the form of a law suit in the state court. That is to say, speaking relatively, there was peace. The employer offered to receive applications from its former employees, and to act on each, and, save for special reasons, to reinstate all to their former jobs.

The union made a collective application for a large group of employees (117) who were its members and some of whom did not individually ask for reinstatement. Most of the old employees were re-engaged. About one-third were not, although some of them sought and secured employment elsewhere and made no effort to find employment with respondent.

The sharply-disputed controversy is over the action of the employer in respect to those who were not reinstated. We might say the controlling issue on this appeal is the non-employment of ten former employees whose application for reinstatement was presented by the Union.

The respondent's reasons for non-reinstatement were several—its policy not to employ married women, not to employ relatives in the same department, incompetence, lack of available positions for returning employees—being the principal ones.

In view of the plain language of the statute, many times effectuated in court decisions[1] that we inquire into the facts only to ascertain the existence (or absence) of substantial evidence to support the findings, it is unnecessary for us to lengthily discuss the testimony or to point out the weaknesses or strength of certain established facts. Inasmuch as it was the Board's province to draw the legitimate inferences from the evidence which it accepts as true and to ascertain the fact where there is a dispute, we will avoid as much as possible a recital of facts over which there is dispute. We accept as a verity the findings of the Board, except those hereafter discussed, which are assailed because, allegedly, wholly lacking in evidentiary support. These findings are generally against respondent.

In view of its early record the Board was justified in scrutinizing respondent's action closely and skeptically to see whether its professions of a changed attitude toward its employees were genuine and sincere, or only a lip acceptance of the Act which had just won recognition of validity from the Supreme Court.

This brings us to the sharp question of controversy, i. e., the refusal to reinstate the employees. Notwithstanding the handicaps of birth and the indiscretions of its youth, respondent has presented a persuasive argument in its favor which brings the case into the doubtful class, notwithstanding the strong presumptions which attend the Board's findings.

Respondent meets the argument that it was in its early history hostile to unionism by pointing to its record which showed that it abandoned the yellow dog contract as far back as 1929, long before the Norris-LaGuardia Act declared such contracts to be against public policy. It complied with the National Industrial Recovery Act, even after it had been declared unconstitutional. When the complaining union which filed the charge before the Board, demanded recognition in November, 1936, claiming a majority, the company stated it would acknowledge such union if an election by the Board disclosed the union represented a majority. The union refused such an election, and a strike was called, December 5, 1936. The union later consented to an election, which was held December 9, 1936. The union was thereupon named the bargaining agent, and the com-

[1] N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; Montgomery Ward & Co. v. N. L. R. B., 7 Cir., 107 F.2d 555.

pany promptly entered into a collective bargaining agreement in writing with said union. Thereafter meetings of the company and union officials were held weekly, and sometimes oftener, at which meetings many minor adjustments were made in working relations. Minutes were kept of the meetings, which—approved by both sides—are in the record.

A rival union immediately sought to establish itself among the employees. The company's only action was to prohibit any solicitation during company time or on company premises. (An announcement to that effect, posted on the bulletin board, was immediately torn down by some union members.) One employee who was an organizer, but incapable of being a union member because not a production employee, was the subject of attack by the existing union which demanded his discharge. The company refused to discharge him without a hearing. Finally the existing union was persuaded to arbitrate the discharge of this organizer, and although the union member on the arbitration board joined in the vote against the discharge, the union still demanded that said employee be not permitted to return to work.

Two months later another dispute arose over the retention of an employee, Mrs. Culbertson, forelady in the mantle department. On Friday, February 26, 1937, the union demanded that she be discharged by March 2, 8:30 A. M. As an alternative, a strike would be called. Mrs. C. was charged with being "an old crab. They (the girls and the forelady) just can't get along. She makes the girls cry. She demands them to do little simple things that come under the head of school life, not factory life. All in all it is everything that she does. It is quite a major issue." Thus was the complaint against Mrs. C. stated by the employees whose demand for her dismissal was submitted as an alternative to a strike.

There had been previous complaints made to the management regarding Mrs. C. Respondent had spoken to her and urged her to be more careful (probably meaning, more lenient) in her management of the girls.

The union and the company met on Monday, March 1, at which meeting the company sought first to discuss unfinished business, but the union demanded immediate consideration of the Culbertson complaint.

The company refused to discharge Mrs. Culbertson without a hearing, in view of her ten years of able service with the company. Her department was one of the two departments of the company which had shown a profitable operation. The union insisted upon her immediate discharge. The company refused. The union refused to arbitrate. A sit-down strike was called, which began at 8:30, March 2. The sole ground of the strike was the refusal of the company to discharge Mrs. Culbertson —without a hearing.

■ The union was clearly outside its legitimate function when it demanded of the employer that it discharge a foreman for the reason that he or she is "crabby" or that she is too strict a disciplinarian (or that she is desirous of conducting her department so efficiently that it will show a profit to her employer). In fact, we have searched the Act in vain for any authority which gives to the union the right to insist on whom the employer shall employ or not employ as foreman or superintendent. National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The query is natural, if the union can direct the discharge of the foreman or superintendent, may it not also object to and compel the dismissal of the president or secretary and the board of directors of the employer company?

But, if we concede or ignore, for the moment, the right of the union to demand the removal of a foreman or superintendent, in some instances, the question in this case is not met. The issue before us cannot be met save as we consider the ground of the complaint preferred by the union— its refusal to give the employee a hearing—and its threatening alternative of a sit-down strike.

In our opinion, the union's action in demanding the dismissal of this superintendent upon the grounds stated, without a hearing—was not only not justifiable, but was a case of arrogant effrontery.

Ignoring for the moment the illegal character of the strike, the employees' demand for dismissal of a faithful employee of ten years' service, without a hearing given to said employee, is so extraordinary and so unreasonable as to excite doubt as to the correctness of the statement of the Union's demands. However, the excesses to which one intoxicated with power will go, at

times, is shown not only by this unreasonable demand, but by the strike which from the start was a sit-down strike with all the offensive characteristics of a sit-down strike.

We have no hesitancy in reaching the conclusion that as to this phase of the controversy the respondent was in the right, the employees were clearly wrong. Because the respondent refused to discharge Mrs. C. a strike was called. A sit-down strike, it was. The union took possession of the plant. Its members occupied the premises and refused to turn it over to the owner. They held possession. about two weeks. Three weeks later the plant was reopened.

During the sit-down strike, respondent sought relief from a court of competent jurisdiction. An injunction was issued against the sit-down strikers who refused to obey the injunction and defied the court.

Final disposition of this case turns largely upon the activities of both sides, following this sit-down strike.

The sit-down strike continued from March 2 to March 16. On March 24, respondent sent its employees a long letter offering re-employment.[2]

The plant was reopened on April 5. Many employees, whose qualifications had been passed on by foremen, irrespective of union affiliations, or sit-down strike activities, were engaged. A substantial number (perhaps half) of those selected were former sit-down strikers and pickets.

At the time the plant closed, respondent had 550 employees, of whom 517 were eligible as union members. 362 had voted in favor of the union as their bargaining agent. At the time of the strike, 95% of the former employees who were eligible, were union members.

On April 17, the union presented an application for return to work of members who were former employees. The foremen and supervisors were instructed to go through this list and determine who should be reinstated. Selection was to be based on competency, and also with due regard to the company's policy of reducing the number of married women employees. Some employees—at least eleven—whose names were on the union application, were re-employed.

In all, 331 of the company's former employees were re-employed. The trial examiner recommended dismissal of the charge against respondent as to 46 former employees. Various reasons were given, —failure to appear, employment elsewhere, refusal to be re-employed, and already re-hired. The Board approved the examiner's recommendation as to these 46 former employees.

The trial examiner also recommended that 95 be reinstated with back pay. He refused to receive testimony of the strikers' action in refusing to obey the court's injunction and found that the sit down strikers were employees after their discharge, and entitled to reinstatement and back pay for the time they were not employed. He also found, on all disputes involving veracity of employee and employer's superintendents or foremen, that employee's testimony was truthful and should be accepted.

The Board rejected the examiner's recommendation in part. It dismissed 63 of the 95 employees because they actively participated in the sit down strike. Of the remaining 32, the Board dismissed 22, on what might be called the merits of their applications.

This left ten who the Board found were entitled to reinstatement and back pay. Respondent failed to reinstate them for various reasons. The controversy here is narrowed to the action of the Board in ordering their reinstatement. The finding of the Board that respondent violated Section 8(3) is based on the latter's refusal to reinstate these ten union members. Its action, in refusing or failing to reinstate these ten employees, was construed by the Board as discouraging employees' membership in unions and therefore a violation of said Section 8(3).

There were charges, sustained by the Board, which relate to violations of Section 8(1). But they were not only outside the charges which respondent was called upon to answer and to meet, but they go behind the date of the sit down strike and its settlement.

---

[2] It was this letter which some employees said they believed prohibited their return unless they would again subscribe to yellow dog contracts. The Board and the Regional Director held no such implication was to be found in this letter.

When the sit-down strike was started, respondent discharged its employees.

While justified in looking to the past to ascertain the good faith of later actions and professions, we are convinced that this appeal must be determined by what took place after the second strike and its settlement in 1937. Both sides seemingly accepted this settlement as a new starting point. With the opening of the plant there was apparently a mutual exchange of forgiveness and the beginning of a new effort by both parties to work harmoniously and effectively that increased prosperity and increased employment might result. If we go back of this date we find ourselves confronted by respondent's reactionary stalwartism—matched by the employees' injudicious attempt to dictate managerial policy followed by its ill-advised action in staging a sit down strike.

Unless we accept this settlement as the beginning of a new era and the termination of past grievances, the disputed issues will be hopelessly multiplied and we must ignore the action of the parties who endeavored to close the doors to a past which was filled with mistakes and regrets,—and disappointments. Surely, the Board and the court should accept the good faith agreements of employees and employer when they settle their disputes. We should not try to keep the fires of discord burning, when the parties themselves are earnestly endeavoring to permit a little harmony "to creep in."

We can thus safely and fairly narrow our issues to the date which marked the opening of the plant, after the March, 1937, sit down strike. If we were to go back of March 2, the employees would be without right—for their sit down strike and their refusal to obey the order of the court, followed by their discharge because of such action, lost to them the right they otherwise might have enjoyed as employees, with an unsettled labor dispute.

■ On the other hand, it would be unfair, in view of this settlement to give to respondent a right which it deliberately and, as we believe, wisely, waived in the interest of peace and harmony. When respondent invited its employees to return to their old places, regardless of the sit down strike, it waived its right to treat the employees as though they were wrong doers whose lawless possession of employer's property, changed the former employees' status to that of tort feasors.

The employees' acceptance of re-employment without pressing their grievance against Mrs. Culbertson, and the respondent's acceptance of many sit down strikers without regard to their misconduct, constituted an implied exchange of forgiveness behind which we neither can, nor should, go.

It is true, there may be a question about the loss of an employee status by a striking employee who did not participate actively as a dispossessor,—as a sitter. The Board takes the position that only those who were actual sit down strikers in the plant are bound by the rule announced in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. While inclined to the other view, namely, that all members of a union who participate in a sit down strike called by *the union*, are liable, although a number less than the entire membership actually occupies the premises, and are bound by the consequences of the union's action, it is not necessary for us here, to decide that question. It is, moreover, difficult to distinguish between a member, who at the direction of the union, becomes an unlawful occupant of the plant during the strike, and another union member, who instead of sitting in the plant, feeds the sitter. Both are, we think, wilful tort feasors.

Viewing the situation as we do, namely, that a settlement of mutual claims and grievances took place, we assume, and conclude, that grievances antedating said settlement which marked the reopening of the plant, were, by respondent, fully and completely waived. The same applies to the employees.

There was both an implied and an express agreement on the part of respondent to accept all employees, regardless of their past strike record, and subject only to their record of competency, and their blood or marital relation limitations as above stated.

■ Respondent does not, and cannot argue that it may refuse employment to the ten employees in question for any reason other than they were incompetent, or their marital status or blood relation to other employees in the same department, or that the absence of an opening when application was received justifies its action.

The employees' right to absolute re-employment and to back pay, on the other hand, is dependent on our approval of the Board's finding that non-reinstatement

was due to their union membership evidenced by the presentation of their application through the union rather than through individual applications as the respondent requested.

This brings us to the claims of the specific ten former employees, as advanced by counsel for the Board, and the objections of the respondent to their reinstatement, with back pay. The ten employees were: Charles Cummins, Mary Cunningham, Irma Dickerson, Edythe Disbennet, Ethel Dyer, Virgil Holford, Melvin Kane, Helen May McCarty, Mabel Rebuck, and Anna Thompson.

We set forth below a statement respecting three of the ten employees, which may well be said to be typical of the entire ten.[3] The other seven were employees who were no more prominent in em-

---

[3] As to Charles Cummins, the Board found:

"Cummins * * * began work * * * in June 1934 and * ʸ * except for 6 .months' lay-off, worked * * * until the sit-down strike. He worked on * * * a moving belt, in the glass-finishing department. He served on the picket line * * * maintained * * * by the sit-down strikers.

"Cummins did not sign the company application. He went to the plant sometime in June and was told by Almquist that all the positions in the glass-finishing deparment were already filled and * * * there were no vacancies in any other department. Almquist said nothing about the quality of his work nor did he suggest that he file a company application.

"* * * Watkins, Cummins' foreman, recommended against his reinstatement because 'he was a very poor worker and on top of this a good loafer.' Cummins testified * * * that Watkins had praised him * * * prior to the strike. * * * Hellmers, superintendent * * * testified that he * * * observed Cummins' work and that it was satisfactory but that 'he spent a lot of time sitting around down there.' * * * Green, a * * * foreman * * * testified that on one occasion * * * Cummins 'dozed off and fell in a truck and cut his arm,' and that 'at lunch time when the shop would be stopped he would go to sleep and I would have to wake him up and tell him the ware was coming off the lehr.' * * * The record, however, shows that operations in the glass-finishing department were not fully resumed until about 4 weeks after the plant reopened, and that only 303 employees had been rehired by April 16. It cannot * * * be (said) * * * that there were no jobs available in the glass-finishing department on April 17 when Cummins had signed the union application."

The Company presents this picture of its refusal to re-employ Cummins:

"Cummins testified that he had an argument with Watkins, the foreman, in January, 1937, when he refused to gather up papers as directed by the foreman, and

insisted upon bringing them into the glass house contrary to his orders. The foreman threatened to fire him then. Henry Hellmers, the superintendent, noticed that Cummins 'spent a lot of time sitting around down there' during working hours.

"The night foreman, Green, reported that Cummins went to sleep on the job. On one occasion while working at night he had dozed off, fell in a truck and cut his arm. He had a habit of falling asleep at noontime, and when work was resumed he had to be awakened and told to take the ware off the lehr * * *.

"The foreman, Watkins, in his written report, made after considering the desirability of rehiring Cummins, said: 'He was a lehr man on chimneys. He was a very poor worker, and, on top of this, a good loafer. I could not consider rehiring him for my department; I can't use him.'"

As to Mary Cunningham, the Board found:

"Cunningham is unmarried. She has been employed since June 1933 and worked in the parchment-shade department. She picketed and did not return the company application.

"She personally communicated with A. with respect to work at any job. * * * A. told her that she would be considered for the lacquer department * * * when the work * * * would pick up. A. testified that she was still being considered for reinstatement.

"Jones, the foreman of the parchment-shade department, did not recommend her favorably allegedly because 'she was slow and she didn't make her rates.' At the hearing, J. admitted that 'her work was all right,' but insisted that 'she was slow * * * she didn't seem to have much initiative' * * *. A. * * * testified, that according to factory reports she was 'a good worker.' It is clear * * * that the assertion that she was an unsatisfactory employee has no basis in fact. The tenuousness of such assertion is further made clear in the respondent's brief which states that (she) * * * 'is still being considered for employment when an opening is available and has not previously been re-employed because she

384

ployment or pronounced in their union activities than these three.

The Board based its action on the assumption that the employer denied reinstatement to these ten employees because they had applied for employment through the union and thus indicated a partisan adherence to said union. There would be more support for this conclusion if the ten employees were active, aggressive members of the union, or were the only members of the union not employed. Hundreds of former union employees were reinstated. Among them were the active, aggressive leaders in the strike and other union activities. They included those who insisted on the discharge of Mrs. Culbertson. Also among the reinstated

was a slow worker and did not make her rates.' If she had been an unsatisfactory employee, presumably she would not have been considered for reinstatement at any time. There is nothing in the record to indicate * * * that when the union application was submitted * * * there was no work available for (her) * * *. We believe that the real reason for her non-reinstatement was *that she had signed the union application and had thus manifested her continuing loyalty to the Union.*"

The Company contends the facts are: "Mary Cunningham * * * She testified * * * she understood the Company desired her to file an application if she wanted to return * * * but didn't think it was necessary to comply * * *. She applied for reinstatement by signing the Union request * * * on *April 17, 1937,* but in September, * * * at the trial * * * she testified * * * she didn't * * * want to return * * * unless all the rest of them went back.

"At the time * * * Jones, her foreman, considered her qualifications for re-employment, he consulted * * * his assistant, Mrs. McCarty. * * * Jones didn't know whether she belonged to the Union or not, and didn't make any effort to find out.

"Jones * * * testified * * * that 'her work was all right except she was slow; * * * she didn't seem to have much initiative,' and that even had she wanted to return to work * * * he would not have recommended her for re-employment. The employment manager testified * * * that in general she was a good worker, but his report showed that she was slow on some jobs * * * he would later give consideration to re-employing her for work in a different department. * * *."

As to Edythe Disbennet, the Board stated:

"She * * * worked for the respondent since 1929. * * * she was employed in the mantle department. She did not * * * return the company application.

"She * * * is the wife of Clay Disbennet, a supervisor in the wick * * * department which, is closely as-

sociated with the mantle department. Spangler reported that she was a satisfactory employee but recommended that she should not be reinstated in the mantle department on the ground that the policy against assigning an employee to a department supervised by a relative * * * was applicable to her. He advanced no reason, however, against her being placed in another department.

"Sometime in April, after * * * the union application * * * A. asked her, 'You signed the general application, didn't you?' She replied in the affirmative. A. then asked whether she wanted to sign another application. Disbennet retorted, 'I have signed one application, I think that will be enough.' A. finally promised to put her to work if he could find a place for her, stating * * * he would not assign her to the mantle department because her husband was supervisor * * *. D. communicated with A. on several further occasions but was (told) * * * he had not found an opening. A. admitted that, from all reports, she was a good worker. He testified, * * * that he experienced difficulty in finding a vacancy for her in another department.

"We are not convinced that the real reason for denying reinstatement to D. was that she fell within the * * * policy against hiring an employee in a department under the supervision of a relative * * *. While the wick * * * department may have been closely related to the mantle department, D. came under the sole supervision of Mrs. Culbertson, the forelady of the mantle department for the purposes of this policy, is shown by the fact that Mrs. C.'s stepdaughter and sister * * * who had worked under Mrs. C. before the strike, were both transferred to the flamespreader department after the * * * strike. Nor do we believe that D. was not given employment in another department, because A. encountered difficulty in finding a place for her. As already indicated, many new employees were hired by the respondent after April 17, * * *. We find that D. was not reinstated to the mantle department or given employment in another department for

were those who took possession of respondent's plant and refused to obey the court's order to return it. Surely, if retaliation for union activities motivated respondent, it is hardly believable that ten of the lesser important, milder union employees would be selected for discipline.

As illustrative of this, let us take the case of Edythe Disbennet, one of the ten. Respondent says she was not re-employed in her old department because her husband was supervisor in the wick department.

In as much as Mrs. Culbertson's action was the immediate cause of the sit down strike, Mrs. D. was asked concerning her relations with Mrs. C. She replied that they were always pleasant—"She treated me swell." Employees, Regina Hughes, Marie Beeman, and Mrs. Harriet Noble, were each most insistent in demanding the removal of Mrs. Culbertson, before the strike, yet all three were re-employed.

Mrs. Disbennet was not an active participant in the sit down strike, that is, she was not a sitter in the plant during the strike. Failure to re-employ her could not therefore be attributed to her aggressive espousal of the union cause. Yet the Board found she was not re-engaged because of her union support.

It would likewise appear that respondent's anti-union hostility must have lost some of its heat in the summer of 1937, and before the refusal to reinstate these ten former employees became the important issue it has since assumed. On June 1, 350 (about two-thirds) of all employees gave respondent written notice that they had withdrawn from the C. I. O. union and asked respondent not to let said Union represent them further.

Respondent advances five reasons why the Board's findings can not stand.

(a) The employment of a large majority of sit down strikers and non-sit down strikers, all members of the union, and their reinstatement to their old positions, shows an absence of discrimination against the Union.

(b) The policy which eliminated wives and other relatives from the same department as their husbands or other relatives, is reasonable.

(c) Good reasons for not re-employing each of the ten old employees are given.

(d) The employer must be given the right to determine the policy of employment otherwise efficiency is impossible. Likewise, there will be greater harmony

---

the reason that she had signed the union application and remained loyal to the Union."

The Company contends as to Edythe Disbennet:

"She worked in the mantle department. She signed * * * the Union and also signed the Company application on May 10. She is a married woman, supported by her husband, who is the supervisor in charge of the wick * * * division * * *. Her husband was re-employed * * *. She testified that her relations with her forelady, Mrs. C. were always pleasant. 'She treated me swell'. At a meeting of the Union about the time the sit-down strike was called, some of * * * those * * * who were most insistent in demanding the removal of Mrs. C. were Regina Hughes, Marie Beeman and Mrs. Harriet Noble, all of whom have been re-employed. * * * Mrs. C. was a strict disciplinarian. * * *

"Mrs. D. was not in the sit-down strike. However, she aided by serving * * * food * * *. When the strike began, temporary permission was granted * * * for this committee to enter * * *. This permission was cancelled * * * by demand for evacuation of the premises, * * * and also on March 4

by the notice to striking employees that they no longer were in the company employ. * * *

"Counsel * * * after the opinion * * * in the Fansteel case, admitted that Edythe Disbennet served on the said Food Committee * * *. The sit-down strike first began in the mantle department. * * * The chief reason (she) * * * was not rehired was, as testified by A. the employment manager * * *, 'The reason for not rehiring D. is strictly company policy. * * * Edythe was informed * * * why she was not called back to the mantle department. I told her that if we placed her in any job it would have to be in some * * * department other than the mantle * * *. Then the old story of married ladies came up. The other foremen had difficulty in finding a place for her. I will say as to Edythe, as to her work, the information I received, her work was satisfactory.' The real reason she was not reinstated is because her husband was a sub-foreman in the same department. That was explained to her a couple of times, and she said she didn't believe she could give up her husband for a job."

than if employees determine employment policy.

(e) The good faith effort of the employer to fairly conduct the employment part of the business is attested by hundreds of its present former union employees.

Turn now to the other side of the picture. The Board argues from the fact that the respondent could advance no real good reason for not re-employing these ten, it followed that their union activities and their application through the union instead of individually, must be the explanation of respondent's action. Furthermore, the records of employment show a lower percentage of union members employed after the settlement of the strike, than before the strike. They also show a much lower percentage of former employees who successfully applied, through the union, than those who applied individually and without the union's aid.

Moreover, these ten union members were all old employees. No serious objection was made to the employment of any of them on the hearing. Significant is the fact that such complaints as were made were never mentioned by the respondent until after this difficulty arose and said members had made application through the union.

The Board was seemingly of the opinion that the company had not changed its attitude of mistrust and dislike of the union. While not sharing that opinion, it must be admitted that it was not entirely without evidence to support its conviction.

The letter to the employees, inclosing application for re-employment, lent some support for this conclusion.

The union was having difficulty holding its membership. The petition signed by two-thirds of the members, bearing date of June, 1937, and announcing their withdrawal from said union was information to respondent, which gave it an added reason for a renewed effort to weaken or destroy the union. Might not this end be furthered by the rejection of applications presented by the union?

Support of the Board's conclusion may also be found in statistics and the percentages of reinstatement. Many other union members who made application through the union, besides the·ten before us now, were rejected. The percentage figures of those whose applications were presented by the union, and not re-employed, is suspiciously large.[4]

The ultimate question we must determine is rather baffling.

■ While we could and would have found contrary to the findings of the Board, we believe there was some evidence, *not very substantial nor persuasive*, but *some* evidence, which sustains the Board's finding. Such being the situation as to the ten employees, the finding of the Board that they were not re-employed because their applications were made through the union must be sustained.

■ It follows, and without much question, that if the rejection of their application was for this reason, the Company violated Section 8 (3) and was properly subject to the Board's order to cease and desist. In all other matters, particularly those going before the settlement of the strike and the commencement of what we call the new era, the findings and conclusions of the Board cannot be sustained.

The order of the Board in reference to the ten unemployed former employees, and the order to cease and desist, based upon the refusal of the company to reinstate these employees because of their application through the union, will be enforced. A proper order to that effect

---

4 Table showing percentage of Union application re-employment:

Number of employees in company's employ Sept. 17, 1937............ 537 (an increase of 33 over pre-strike employment.)

Of this number, 332 were old employees.

The number of old employees not reinstated was.................. 172

The number of union members recalled was at least.............. 200

The number of old employees who had not signed the union application and were not reinstated because of incompetency was....... 10

The number in the union application was........................ 117

The number in union application who were reinstated was............ 11

The number in union application who were not reinstated was........ 80 (no evidence as to others)

The number who did not sign union application was................. 398

The number who did not sign union application who were not reinstated was (4 of these did not apply).. 92

may be presented. In all other respects, the application of the petitioner is denied.

SPARKS, Circuit Judge. I concur in that part of the opinion which reverses the Board's order. I dissent ·from that part of the opinion which affirms the Board's order.