**JONES & McKNIGHT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 18787.**

United States Court of Appeals, Seventh Circuit.

June 23, 1971.

---

5. See, e. g.:

98

Gerhard E. Seidel, Russell M. Pelton, Jr., Arthur C. Perivolidis, Chicago, Ill., for appellant-petitioner Jones & Mc-Knight, Inc.; Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles Both, Attys., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Abigail Cooley Baskir, Madge F. Jefferson, Attys., NLRB, for respondent.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

CASTLE, Senior Circuit Judge.

This case is before the Court on the petition of Jones & McKnight, Inc.[1] to review and set aside, and the cross-application of the National Labor Relations Board to enforce, an order of the Board issued against the Company on June 8, 1970. The Board's decision and order are reported at 183 NLRB No. 10.

The Board found and concluded that the Company violated Section 8(a) (1) of the National Labor Relations Act, as amended, by discharging six employees and refusing to reinstate four employees on July 17, 1969, and by discharging twenty-three employees on July 23, 1969, because they engaged in protected strike activity. The Board's order directs the Company to cease and desist from such unfair labor practices and to reinstate with back pay nine of the employees[2] discharged on July 17, and to reinstate upon application the twenty-three employees discharged on July 23. The order also requires the Company to post designated notices.

The Board's findings and conclusions[3] that the Company violated Section 8(a) (1) of the Act[4] by the ten July 17 discharges and failures to reinstate, and by its subsequent July 23 discharge of an additional twenty-three employees for participation in a strike in protest of the July 17 discharges, is premised on the Board's conclusion that the Company condoned the July 17 strike activities engaged in by the ten employees in violation of the no-strike provisions of the collective bargaining agreement.

The Company contends that the record considered as a whole does not reveal substantial evidence to support a finding and conclusion that the Company condoned the admittedly unlawful July 17 conduct of the affected employees; that the Company was therefore within its rights in discharging the ten employees it discharged on July 17; and that, consequently, the subsequent strike was an unprotected activity which justified the July 23 discharges. The Company additionally contends that the failure of the discharged employees to follow the grievance procedure of the collective bargaining agreement precludes assertion of the discharges as an unfair labor practice and also makes the strike which followed the July 17 discharges an unprotected activity. It is further contended that the strike activity, both on July 17 and subsequently, was in derogation of the position of the union representing the employees;[5] was therefore unprotected activity; constituted a "wildcat" strike; and that to penalize the Company for the disciplinary discharges made because of such employee conduct is contrary to the purposes and objectives of the National Labor Relations Act.

---

1. Hereinafter referred to as the "Company".

2. The Board did not order the reinstatement of the additional employee discharged July 17, Roger Kilman, because of his plan, announced prior to that date, to quit the Company's employ on July 18, 1969.

3. With the exception of a corrective substitution with respect to the name of one of the employees involved, the Board adopted the findings, conclusions, and recommendations of the trial examiner.

4. Section 8(a) (1) makes it an unfair labor practice for an employer to interfere with (such as by discharge) the Section 7 rights of employees to, *inter alia*, engage in concerted activity for the purpose of mutual aid or protection.

5. Local No. 15429 of The International Union of District 50, United Mine Workers of America. Hereinafter referred to as the "Union".

The record discloses that the Company is engaged in the business of manufacturing steel mats and related products. The mats are used in road construction, being placed in the roadbed and then covered with concrete. The Union, the exclusive bargaining agent for the Company employees here involved, had a collective bargaining agreement with the Company which included an express no-strike clause, and a grievance and arbitration procedure culminating in final and binding arbitration. The grievance and arbitration procedure included employee discharges within its scope.

In mid-July, 1969, the women employees here involved were engaged in the tieing of both 12-foot and 6-foot mats at the Company's North plant.[6] This work was done inside the plant on a three shift basis, with restroom facilities and drinking water nearby. On July 15, near the end of the first shift, the women mat-tiers were advised by the foreman that all of them would be tieing 12-foot mats in the future. The following morning the employees were further advised that some of the 12-foot mats would have to be tied outside but, due to the heat, crews would be rotated so each would work outside for only two hours at a time. No outside work was done that day, however, because no 12-foot mats were ready for tieing. On July 17, the foreman again assembled the first shift employees and apprised them of a further change in work plans—that all the 12-foot mats would now be tied outside. When one employee inquired if she could utilize her seniority to transfer to a different department she was advised that "seniority did not count" in the matter and that "if she wanted a job she would be tieing the 12-foot mats" on the outside with the others. The employees then proceeded to work in the plant yard tieing the 12-foot mats. It was a humid day, and by noon the temperature was in the mid to upper 90's.

During the lunch break several of the employees discussed the new working conditions and decided to examine the bargaining contract to see if it contained anything about tieing mats outside in the sun. Three of the employees asked Wayne E. Isaacs, the plant superintendent, if they could see the contract. He was unwilling to let them examine the contract on company time, but this was seemingly resolved when one of the three employees, Joan Gray, suggested that they wait until their 1:30 p. m. break to examine the contract. The employees started moving from the lunchroom to their work stations outside the plant, but, when they reached the door, they stopped and refused to spend another one and one-half hours in the sun before seeing the contract. At this juncture, Eugene Keeler, the dayshift union steward took employees Alice Steele and Luvenia Johnson with him to Isaacs' office where Isaacs gave them the contract, which they took to the lunchroom to read.

Isaacs then approached the women workers still assembled at the west door of the plant and asked several of them if they were going back to work. Each replied that she would abide by the decision of the group. Four male employees, James Goldsberry, Leslie Harshberger, Roger Kilman, and Fred Harrawood, all yardmen, who had stopped working in support of the women mat-tiers, were also standing near the door with the women employees. Isaacs asked each of the men if he was going to resume work. They responded that they were "thinking about it". Isaacs insisted on a "yes or no" answer and when they refused, Isaacs discharged them. Isaacs then informed the women employees to either resume their work or get off the property. Most of those in the group left the building and assembled on the road near the plant's west gate. Isaacs then returned to the lunchroom where employees Steele, Johnson, Gray and Keeler were examining the contract. He told them that the contract contained nothing about the tieing

6. This is one of the three plants the Company operates in the Kankakee, Illinois, area.

of mats outside. He added that the 12-foot mats would be tied outside, and that they should so inform the rest of the employees. He then took the contract and left. The four employees then joined those assembled on the road at the west gate and Steele reported what Isaacs had said concerning the contract and the continuation of the outside work. Isaacs then appeared at the gate and again asked the four male employees if they were going back to work. Upon receiving the same answers as before, he informed them for the second time that they were discharged. He told the women in the group that if they wanted to go back to work they could. None of them did.

Some of the employees remained outside the plant on the county road while Gray telephoned Vernon Morris, the Union representative servicing the plant's local (Local No. 15429) to enlist his aid. At about 3:00 p. m. Steele, Gray and International Representative Morris met with Isaacs and Donald J. Rasor, the manager of all three Company plants in the area. Morris questioned Rasor about the Company's requirement that the women employees tie mats in the hot sun for eight hours. In addition the matter of incentive pay was raised,[7] and Morris asked to see certain of the Company's records. The records were not available at the North plant, and the meeting adjourned to resume later in the day at the Company's West Lawn Street plant.

Many of the striking employees remained at the plant gates, and their picketing was so successful that only two employees out of the forty-five to fifty-five second shift employees worked the second shift. The second shift's hours were from 3:30 p. m. to 12 midnight.

The meeting at the West Lawn Street plant lasted from about 4:45 p. m. to about 6:45 p. m. It included an additional two employees representing the second-shift workers. Following a discussion of the matters, Rasor agreed to lower the quota for the 12-foot mats; increase the incentive rate on the 12-foot mats from 58 cents to $1.16, retroactive to July 14; and to give the mat tiers a 10 minute break in the shade each hour, if the picketing at the plant gates ceased. Rasor stated that the increase to be made in the incentive rate would be subject to the approval of the Company's president, but that Rasor wanted the pickets removed from the gates by the time the third shift reported for work that evening.[8] Morris told Rasor that he thought it advisable that the discharged employees be taken back because they had "got up to that point of settling the trouble". Rasor reluctantly agreed that Goldsberry, Harshberger and Harrawood would be put back on the job, if the pickets were taken off the gates.

Employees Gray, Johnson, Glenn and Milton (the latter two were from the second shift workers) returned to the North plant and spoke to the employees on their respective shifts, advising them of the results of the meeting, and that if the employees went home and the third shift was permitted to come to work Rasor would take all the employees, including the discharged men, back to work the following day. All of the employees were satisfied and were ready to go home, except the yardmen, who preferred to have the agreement in writing. Gray telephoned Rasor with respect to the request made by the discharged yardmen. He told her to call Morris. Morris, when advised of this development, promised to see what he could do, adding, "But be sure you get that picket line down". Gray reported the content of her telephone conversations with Rasor and Morris. The men then agreed that they should go home.

Before the few employees who had remained at the gates left, the picket signs

---

7. Compensation included an incentive rate based upon the number of mats completed in excess of established quotas.

8. The third shift's hours were from 11:30 p. m. until 7:30 a. m.

which had been posted were taken down. Johnson, who had remained to wait for her daughter to pick her up, helped the men remove the picket signs, and after observing the men drive away in their car, Johnson left with her daughter at about 7:50 p. m.

The Company's records disclose that 20 employees, which is more than the normal employee complement working the shift during July 1969, worked the third shift which commenced at 11:30 that evening.

After receiving Gray's telephone call Morris telephoned Rasor and told him he saw no reason why the agreement which had been reached could not be put into writing. Rasor declined to comment but arranged with Morris to telephone him later that evening after Rasor had consulted with his superiors. When Rasor did call it was to inform Morris that in addition to the discharged yardmen six of the women mat-tiers were to be discharged. Rasor named Gray as one of the women to be discharged. Morris then telephoned Gray, reaching her about 12:30 a. m., and advised her that she and certain of the other women employees, who he named were to be discharged.[9]

On the morning of July 18, Gray arrived at the North plant between 6:30 and 6:45. She looked for her timecard in the customary place but it was not there. Nor could she find the timecards of the others whom Morris had said were to be discharged. She then went to the gate, and, as the employees arrived for the first shift, she informed those who had been fired. Some of the co-workers from the first shift struck in protest against the discharges. Only seven employees worked on the first shift that day out of a normal complement, including the dischargees of about twenty employees. The strike gained supporters and continued through the ensuing week. Some of the employees, in support of the strike, engaged in picketing the Company plant. However, the strike was not sanctioned by the Union and Morris specifically repudiated the strike action. On July 23 the Company terminated an additional 23 employees for engaging in the then current strike activity.

■ It thus appears that the Company discharged six employees and refused to reinstate four others because of their participation in the July 17 work stoppage and picketing in protest of the change made in working conditions. The Board concedes that the July 17 strike was conducted in contravention of the grievance and no-strike provisions of the parties' collective bargaining agreement. But the Board urges that there is substantial evidence on the record considered as a whole to support the Board's finding and conclusion that the Company condoned and forgave the employees' July 17 strike activity and conduct by the agreement made by Rasor that if the picketing ceased, and the pickets were removed from the plant gates by the time the third shift was to report for work that evening, so that normal production could be resumed, the Company would take back the discharged yardmen and all the employees could return to work. In this connection, the Board relies on the principle recognized in a number of decisions it cites, including N. L. R. B. v. Aladdin Industries, 7 Cir., 125 F.2d 377, 382; Stewart Die Casting Corp. v. N. L. R. B., 7 Cir., 114 F.2d 849, 855–856, and Confectionery & Tobacco Drivers, etc., Local 805, I. B. T. C. W. H. A. v. N. L. R. B., 2 Cir., 312 F.2d 108, 112–113, to the effect that where employees engage in concerted activity which, although otherwise lawful and protected, is rendered unprotected by some improper aspect of the employees' conduct, such as a breach of a no-strike clause, but the employer forgives or condones the strike, he will thereafter be estopped from asserting the unlawful nature of the strike as grounds for discharge.

9. A letter and telegram dated July 18 were thereafter received by Morris confirming the discharge of the employees Rasor had named in the telephone call to Morris.

The primary purpose of the Act is to further industrial peace, and effectuation of this statutory policy demands that parties to a strike settlement be precluded from going behind their agreement to reopen a matter which they have waived in the interests of peace and harmony. As this Court stated in Aladdin Industries, *supra* (125 F. 2d at 382):

"Unless we accept this settlement as the beginning of a new era and the termination of past grievances, the disputed issues will be hopelessly multiplied and we must ignore the action of the parties who endeavored to close the doors to a past which was filled with mistakes and regrets,—and disappointments. Surely, the Board and the court should accept the good faith agreements of employees and employer when they settle their disputes. We should not try to keep the fires of discord burning, when the parties themselves are earnestly endeavoring to permit a little harmony 'to creep in'."

In Packers Hide Association v. N. L. R. B., 8 Cir., 360 F.2d 59, 62, it was pointed out, with respect to the standards governing the application of the doctrine of condonation, that:

"Condonation can be found and is invocable only where there is clear and convincing evidence that the employer has completely forgiven the guilty employee for his misconduct—and agrees to a resumption of the company-employee relationship as though no misconduct had occurred. The doctrine prohibits an employer from misleadingly agreeing to return its employees to work and then taking disciplinary action for something apparently forgiven."

And in Plasti-Line, Inc. v. N. L. R. B., 6 Cir., 278 F.2d 482, the court adopted the standard, earlier propounded in N. L. R. B. v. Marshall Car Wheel & Foundry Co., 5 Cir., 218 F.2d 409, 414, that:

"Where, as here, the strike misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred."

The key element of condonation is a clearly evidenced intention and commitment on the part of the employer to overlook the misconduct and to permit a continuation or resumption of the company-employee relationship as though no misconduct had occurred.

The Company contends that there is a lack of clear and convincing evidence that it condoned the July 17 misconduct of the employees it discharged on that date. We do not agree. Although it was conditioned on the cessation of picketing so that normal production could be resumed with the third shift, and the reinstatement of the discharged yardman was agreed to with reluctance, there was nothing equivocal about Rasor's agreement that *all* of the employees could return to work. It is clear that Rasor's main objective was the restoration of normal production; he made concessions with respect to the quota governing incentive pay, agreed to a 10 minute "break" during each hour of outside work, and promised to attempt to get the company's approval of a raise in the incentive rate for the 12-foot mats. It was only with respect to the four yardmen that he was initially reluctant to forego disciplinary action for the employee misconduct. But, apparently in order to effect a settlement of the dispute and work stoppage, he did agree to their reinstatement.

But the Company urges that the record presents a conflict in testimony as to whether the condition imposed by Rasor was met by the employees—that all picketing activity had ceased prior to the time the third shift workers began to arrive at the plant—and that this conflict makes the evidence on this aspect of the matter less than clear and convincing and thus precludes application of the condonation doctrine. In this connection there is substantial evi-

dence on the record considered as a whole that the picketing activity had ceased by 8:00 p. m. on the evening of July 17. Employee Johnson testified that she left the plant gate at about 7:50 p. m. after observing the other remaining pickets, the three yardmen drive away, and that she was the last of the picketing employees to leave. Harshberger, one of the yardmen, and employee Mary Kurtz each testified that the three yardmen, Harshberger, Harrawood and Goldsberry, arrived at Mary Kurtz's home, some 20 miles distant from the plant at about 8:30 p. m. and remained there until after midnight. Third shift employees Leslie Longtin and Larry Smith testified that they did not notice anything unusual outside the plant gates at 10:45 and 11:25 p. m., respectively, when each reported for work that evening; that there were no cars parked along the county road or employees outside the plant gates. This testimony that the picketing had ceased by about 8:00 p. m. is buttressed by the fact that 20 employees, a number in excess of the third shift's normal complement, worked the third shift that night. And there is no basis in the record for concluding that had the picketing continued into the period of the arrival of the third shift workers it would have been any less successful than it had been in the afternoon when only 2 employees out of the entire second shift elected to ignore the picketing and to enter the plant for work. The opposing testimony of Company witnesses Rasor, Isaacs and second shift forelady, Hermaine Hart, that they saw vehicles and employees in the vicinity of the plant at various times during that evening; that at approximately 8:00 p. m. the picket line had not been lifted; and that when Isaacs returned to the plant at about 9:00 p. m. Harrawood approached his car as Isaacs was entering the plant, was specifically appraised by the trial examiner and on the basis of credibility resolutions found to lack probative value. From our examination of the record we find that it presents no exceptional circumstances which would make inapplicable the rule that the Board's action in crediting or discrediting witnesses will not ordinarily be disturbed on review. Sarkes Tarzian, Inc. v. N. L. R. B., 7 Cir., 374 F.2d 734, 736.

The offer of condonation here involved was conditional. It was made with a reservation that picketing cease. But, assuming, without deciding, that in order for the doctrine of condonation to be effectively invoked the circumstances here required that fulfillment of the condition, as well as existence of the element of employer intent to forgive and its commitment to continuation of the company-employee relationship, also must be established by clear and convincing evidence, we are of the view, nevertheless, that the fact that conflicting testimony made credibility resolutions necessary does not detract from the clear and convincing character of the credited testimony and evidence.

■ Consequently, on the record before us, considered as a whole, we perceive no basis either in fact or in law which would warrant us to disturb the Board's finding and conclusion that the Company's July 17 refusals to reinstate the discharged yardmen and its discharge of the six women employees were made after it had condoned the otherwise unprotected aspect of the strike and picketing activity which had occurred earlier that day. And it follows that such refusals to reinstate and discharges were unfair labor practices in violation of Section 8(a) (1) of the Act. This being so, the subsequent strike and picketing activity in protest of the July 17 discharges was a protected activity —an unfair labor practice strike—and the Company's July 23 discharge of the additional 23 employees for participating therein was also an unfair labor practice in violation of Section 8(a) (1). Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309; N. L. R. B. v. Wagner Iron Works, etc., Local 471 (AFL), 7 Cir., 220 F.2d 126, 140–141.

We are not persuaded by the Company's additional argument that failure of the discharged employees to pursue the grievance and arbitration procedure outlined in the collective bargaining agreement precludes assertion of the discharges as an unfair labor practice and thereby deprives the strike activity of its protected status as an unfair labor practice strike. The Company's reliance on Artim Transportation System, Inc. v. N. L. R. B., 7 Cir., 396 F.2d 359, in this connection is misplaced. In *Artim* this Court pointed out (396 F. 2d at 365–366) that the strike there involved did not, like an unfair labor practice strike, fall into one of the judicially-developed exceptions to a no-strike clause and, accordingly, held that:

"The strike was an unauthorized resort to economic force for the purpose of compelling [the employer] to pay the runaround grievance awards before the awards became final. As such, it violated the agreement. The discharges were justified."

Likewise, in the circumstances here involved, the fact that none of the strike activity was sanctioned by the Union is of no import. While there are circumstances where employees who engage in an economic strike may lose protection of the Act if they do so without Union approval (N. L. R. B. v. Sunbeam Lighting Company, 7 Cir., 318 F.2d 661) here, as in *Mastro, supra,* the Board properly concluded that the striking employees were not deprived of the protection of the Act because of their failure to obtain the Union's approval of their unfair labor practice strike. By authorizing a bargaining agent to represent them, the employees cannot be said to have waived all rights to protect themselves against an employer's unlawful actions, since their individual action in such circumstances is not an attempt to undermine their representative's position, but to protest the employer's circumvention of the policies of the Act. And here, the Company's discharge of six employees and its refusal to reinstate four others because of their partic-ipation in a strike which the Company had condoned was a serious unfair labor practice. The policies of the Act would not here be served by holding that lack of the Union's approval required a surrender of the right of concerted self-help.

The petition to set aside the Board's order is denied, and the cross-application for its enforcement is granted. It is ordered that the Board's order be enforced in full.

Enforcement ordered.