**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TEXAS INDUSTRIES, INC., Respondent.**

No. 24255.

United States Court of Appeals
Fifth Circuit.

Dec. 28, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, John E. Nevins, Atty., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Allison W. Brown, Jr., Atty., NLRB, for petitioner.

Fred O. Weldon, Jr., Dallas, Tex., for intervenor.

John Bernard Nelson, John Edward Price, Fort Worth, Tex., for respondent.

Before TUTTLE, GEWIN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

The National Labor Relations Board found that Texas Industries, Inc., violated § 8(a) (3) and (1) of the Act[1] by discharging employee Kenneth Hester, a truck driver, because of union activity. It seeks enforcement of its order requiring reinstatement and back pay and the usual accompanying relief. Enforcement is denied, because there is not substantial evidence that the company had knowledge of any union activity by Hester.

Hester was hired in late April. The company knew he was a union member and then on strike against a motor carrier. Texas Industries was not organized at that time and no organizational activity was going on.

Within a week it became known among his fellow workers that Hester had experience in union matters, and some of them asked him to organize a local at the plant. He declined, indicating that he

---

1. National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

had not completed his 90-day probationary period.

On June 20 Foreman Lewis and Shipping Foreman Meyer called in Hester and reprimanded him for making late deliveries. That was all the conversation—there was no discussion of union or union activities. When Hester left the conference, employee Rich asked what he had been called in for. According to Hester his answer was:

> "I gave him a big line of bull   * *. I said they wanted—Mr. Meyer and Mr. Lewis, they wanted to know if I could help them straighten out the driver's complaints and get everything squared away to where everybody would be happy. I told him that after I got my ninety days in that I was going to the union and then write everything down on paper and hand it over to Mr. Sewell, who was president of the company, and get everything to where everybody would be happy  * *. I just didn't like Mr. Rich, so I just shot him a line of bull there, as to what was said in the office. I did not figure it was any of his business."

The Trial Examiner characterized Hester's version of his conversation with Rich as follows:

> "Because he was embarrassed and disliked and distrusted Blackie, Hester replied with a cock-and-bull story that the aforementioned supervisors had called him in to ask 'if I could help them straighten out the driver's complaints and get everything squared away to where everybody would be happy.' He told Blackie that he had answered his superiors with the remark that after he had served his 90-day probationary period he would go 'to the union and then write everything down on paper and hand it over to Mr. Sewell  * * * president of the company, and get everything to where everybody would be happy.'"

What Hester describes as a "big line of bull," and the Trial Examiner as a "cock-and-bull story", the Board in its brief refers to as "Hester erroneously stated."

These are new euphemisms in judicial proceedings for the making of untrue statements. No one, including Hester, contends the statements were true.

Shortly thereafter Hester told other employees that after his probationary period he would see Mr. Sewell (the company president) "to more or less get that cement plant straightened out," and would get management to fire Meyer and he would take over Meyer's job. In similar euphemistic manner this is characterized as an "erroneous report" by Hester.

Several employees told Meyer about Hester's statements made to Rich and the other drivers. Not more than four or five days after Hester began circulation of the story Meyer saw Hester, and according to Hester, said "Anybody that went to Mr. Sewell, that talked union or anything would get fired for doing such as that," that "you can't say anything around here we don't know," and "the best thing for me to do was to do my job and keep my mouth shut or I would get laid off." Meyer denied that Hester's statements, as relayed to him by others, contained any mention of proposed union activity by Hester or mentioned "union" in any context. He denied that in his conversation with Hester he mentioned "union." There is no support from anyone to whom Hester disseminated his fabrication that Hester's remarks included any reference to "union." There is no evidence from any employee who reported to Meyer that the reports so made included any reference to "union." Thus the tenuous thread of the pro-union content of a fabricated statement by Hester and of the anti-union content of a subsequent actual statement by Meyer, is suspended between, at one end, Hester's credited testimony of his reference to "union" in the story he disseminated, and at the other end, Hester's credited testimony of what Meyer said to him. Insofar as mention of "union," the beginning and the end of the thread, and everything between are supported by testimony of no one else, and the testimony of the

fabricator Hester is accepted over that of all others. However, our decision need not rest on this Alice-in-Wonderland credibility choice.

For purposes of discussion, accepting the Board's conclusions on credibility, when the above events occurred there was no union activity by Hester or anyone else; in Hester's circulated story there was no reference to present union activity, nor did Hester make any "union" statements in his discussion with Meyer. The Board's reasoning is that Meyer was told of Hester's false statements about mentioning "union" to the company, and reacted with an anti-union statement, that this tends to prove that when at a later time Hester did engage in union activity and was fired the discharge was because of that actual activity. The trouble with this is that from late June or early July to mid-August Hester's "cock-and-bull story", and the resulting conversation with Meyer, were not used as ground for discharge. And there is a total absence of evidence that when Hester changed his role to one of actual activity the company had any knowledge of it.

On August 10 Hester obtained union authorization cards from a union representative. In three or four days he signed up 23 of 27 truck drivers. On August 14 he was discharged.[2] The Trial Examiner inferred that because other matters were quickly reported by drivers to supervisors, and supervisors kept a close tab on matters going on at the plant, the company did learn of Hester's union activities and did fire him because of the activities.

Hester's testimony is that in the conference in which he was discharged, after discussion with him of unauthorized stops, and just before he was told of his discharge, he "whipped from his pocket" and displayed to the foreman a handful of signed union cards. This last-minute

revelation by Hester of his union activity, assuming that it occurred, was not a motivating cause of the discharge; in fact when the conference began Hester's truck already had been dispatched to another driver and was gone. The Trial Examiner found, and we think correctly, that the decision to discharge Hester had been made before the conference began.

The evidence in this case is too ephemeral and insubstantial to meet the required standard of substantiality from the record as a whole that Hester was discharged because of union activity.

Enforcement denied.

---

2. While we do not go into the details of grounds for discharge it is appropriate to note that one of the asserted grounds was that Hester had abused his privilege of making stops for breaks, a practice which had been the subject of company concern before Hester circulated his fabricated story, and that there was evidence (including admissions from Hester himself) of such abuse by him.