**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**The BORDEN COMPANY, Respondent.**

**No. 24294.**

United States Court of Appeals
Fifth Circuit.

March 4, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert M. Lieber, Atty., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Glen M. Bendixsen, Atty., NLRB, for petitioner.

C. Dale Stout, Kullman & Lang, New Orleans, La., for respondent.

Before JONES, WISDOM and DYER, Circuit Judges.

WISDOM, Circuit Judge:

February 5, 1965, two employees of The Borden Company began a low key union drive to obtain union representation of the Company's employees. Borden responded—also on a low key—by evidencing in various ways its dislike for unionism. Over a year later a pro-union employee was discharged. The National Labor Relations Board charged Borden with violating Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. The Board, affirming the Trial Examiner, found Borden in violation of the Act and ordered it to cease and desist its antiunion conduct and to reinstate the discharged employee, Alejandro Vasquez. The Board now petitions for enforcement of that order. We enforce the order relating to the Section 8(a) (1) violation. Taking the record as a whole, we find a lack of substantial evidence to support the Board's finding that Vasquez was discharged in violation of Section 8(a) (3).

## I.

We consider it unnecessary to relate in detail each act on the part of Borden Company management that gave rise to the 8(a) (1) violation. We see substantial evidence in the record that (1) in the hiring of two employees Borden or its agent attempted to interrogate the applicants concerning their union sentiments;[1] (2) during a series

---

1. Josephine Garcia testified that in her employment interview she was asked if she had worked for the Union before at any time and was told that the Union wanted to get into Borden's plant, although Borden didn't want it. Herple A. Ellis testified that he took a polygraph test prior to having been hired, during which he was asked if he had ever been in the Union or had anything to do with any un-

of home visits supervisors and managers attempted to induce employees to inform on the union sympathy of fellow employees;[2] (3) in the plant a supervisor created the impression of surveillance of union activity by declaring he had knowledge of the participants and the details of the activity;[3] (4) the plant manager, in a speech to all employees, pointedly referred to the trouble and suffering that could occur because of union entrance into the plant, suggesting the possibility of economic reprisal against union activity.[4]

■■■ We believe it important to point out that in this case Borden's response to the union drive was generally restrained and legally sophisticated. We approve the Company's use of outlines when interviewing does take place, and neither this Court nor the Board condemns home visits as coercive per se. Except for the references to the serious consequences and the far-reaching effect that signing of a union card could have on the employees and their families,[5] we find the speeches made by the plant manager within the realm of privileged conduct; the financial burdens to which union members may be subjected and the company's existing benefits are proper subjects for management presentation.[6] We refer to inoffensive company conduct to underline our view that in this case, as in N.L.R.B. v. R. Meyer Hotel Co., 5 Cir. 1967, 387 F.2d 603, "A careful reading of the joint appendix makes it clear that some of the

ion activities. This Court has consistently disapproved of coercive interrogation concerning union and other protected activities. N.L.R.B. v. Sunnyland Packing Co., 5 Cir. 1966, 369 F.2d 787, 789; N.L.R.B. v. Tidelands Marine Service, Inc., 5 Cir. 1964, 338 F.2d 44, 45–46; N.L.R.B. v. Great Atl. & Pac. Tea Co., 5 Cir. 1965, 346 F.2d 936, 938; N.L.R.B. v. Dell, 5 Cir. 1960, 283 F.2d 733, 736.

2. Alexander R. Sanchez testified that at a home visit he was asked if he knew anybody involved in the Union, and to let the Company know. Herple Ellis testified that during the visit to his home a supervisor wanted to know if anyone had approached him about the Union and was told to let one of the supervisors know if anyone did. We have often condemned management attempts to induce employees to inform on union sympathy of other employees. Brewton Fashions, Inc. v. N.L.R.B., 5 Cir. 1966, 361 F.2d 8, 13; cert. denied 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75; N.L.R.B. v. Tidelands Marine Service, Inc., 5 Cir. 1964, 339 F.2d 291, 293.

3. Alejandro Vasquez testified that the Shipping Superintendent told him that he had known for ten days or so who had signed union cards. General Manager Lon Green had also, in two speeches delivered to the employees, suggested that he was aware of who had signed union cards. Creating the impression of surveillance of union activity by declarations of asserted knowledge of the participants and details of such activity has been used to establish an 8(a) (1) violation. Hendrix

Mfg. Co. v. N.L.R.B., 5 Cir. 1963, 321 F.2d 100, 104–105, n. 7; N.L.R.B. v. Harbison-Fischer Mfg. Co., 5 Cir. 1962, 304 F.2d 738, 739.

4. For example: "The signing of a union card is serious and it could have a far-reaching effect on you, your family, and *your job with the Borden Company* * * *. Don't be put in the position where you hate your fellow employees or they will be hating you. Don't let them put you in the position of being under suspicion of having done the wrong thing. Don't get mixed up in trouble which can cause you and your families to suffer for the rest of your lives." Veiled threats, as well as direct threats, of economic reprisal against union activity have been held violative of 8(a) (1). See N.L.R.B. v. Camco, 5 Cir. 1965, 340 F.2d 803, 804–807, cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; N.L.R.B. v. Griggs Equipment Co., 5 Cir., 307 F.2d 275, 277–278; N.L.R.B. v. Fox Mfg. Co., 5 Cir. 1956, 238 F.2d 211, 214.

5. See note 4, supra.

6. See, e. g., Bonwit Teller, Inc. v. N.L.R.B., 2 Cir. 1952, 197 F.2d 640; Cadillac Marine & Boat Co., 115 NLRB 107, 124 n. 25; American Laundry Machinery Co., 107 NLRB 511, 513.

Similarly, management hopes that employees would not become involved with the union are proper subjects for discussion by an employer. See National Labor Relations Act § 8(c); N.L.R.B. v. Transport Clearings, Inc., 5 Cir. 1962, 311 F.2d 519, 523.

credibility choices made by the trial examiner leave an objective reader of the cold record with some degree of skepticism." Nevertheless, we have reviewed the record with care and, "on the basis of the crediting of the testimony believed by the trial examiner and the Board, we conclude that there was substantial evidence on the record as a whole to require the affirmance of this determination." N.L.R.B. v. R. Meyer Hotel Co., supra, at p. 604.

## II.

■■■ Of course, "management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids." [7] N.L.R.B. v. McGahey, 5 Cir. 1956, 233 F.2d 406, 413. Examining the record as a whole, we fail to find substantial evidence to support the conclusion that in discharging Vasquez Borden discriminated "in regard to * * * tenure of employment * * * to encourage or discourage membership in any labor organization." National Labor Relations Act § 8(a) (3).

■■■ The only facts in the record supporting antiunionism as a motivating factor in Vasquez's discharge are related by Vasquez himself; [8] "the beginning and the end of the thread, and everything between, are supported by testimony of no one else." N.L.R.B. v. Texas Industries, Inc., 5 Cir. 1967, 387 F.2d 426, 427. Many of these facts are not uncontradicted. Thus, while "the

initial choice between two equally conflicting inferences of discriminatory or non-discriminatory employer motivation for an employee discharge is primarily the province of the Board," [9] "the reviewing court must not confine itself to consideration of evidence 'which, when viewed in isolation', supports the Board's findings, but must also take 'into account contradictory evidence or evidence from which conflicting inferences could be drawn.' * * * 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. * * *' " [10]

■■■ We observe at the outset that despite the urging of the General Counsel, we do not view this discharge as the culmination of a coherent campaign establishing a pattern of employer conduct which amply warrants an inference of discriminatory purpose.[11] The General Counsel directs our attention to Great Atlantic & Pacific Tea Co., Inc. v. N.L.R.B., 5 Cir. 1966, 354 F.2d 707, 709, where we said: "the Board is not compelled to accept the employer's statement when there is reasonable cause for believing the ground put forward by the employer was not the true one, and that the real reason was the employer's dissatisfaction with the employee's union activity." We suggest that, by the same token, the Board is not compelled to accept the employee's statement when there is reasonable cause for believing the ground put forward by the employee was not the true one and that the real reason was the employer's dissatisfaction with the employee's performance of his duties on the job. In cases arising under this

7. Accord, N.L.R.B. v. I. V. Sutphin, Co-Atlanta, Inc., 5 Cir. 1967, 373 F.2d 890; N.L.R.B. v. Longhorn Transfer Serv., Inc., 5 Cir. 1965, 346 F.2d 1003, 1006; N.L.R.B. v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197, 200.

8. The record contains conflicting testimony concerning the Company's knowledge of Vasquez's union activity, but we have concluded that credited testimony substantially supports an affirmative finding on this issue.

9. N.L.R.B. v. Coats & Clark, Inc., 5 Cir. 1956, 231 F.2d 567, 572.

10. N.L.R.B. v. Red Top & Baggage Co., 5 Cir. 1967, 383 F.2d 547, 554.

11. See Shattuck Denn Mining Corp. v. N.L.R.B., 9 Cir. 1966, 362 F.2d 466, 469–470; N.L.R.B. v. Nelson Mfg. Co., 6 Cir. 1965, 326 F.2d 397, 398; N.L.R.B. v. Longhorn Transfer Serv. Inc., 5 Cir. 1965, 346 F.2d 1003, 1006.

section of the Act the burden of proof is on the General Counsel, not on the employer.[12]

Vasquez's immediate supervisor—The Superintendent of the Shipping Department—testified that he talked to Vasquez a number of times concerning the over seventy complaints received from route salesmen about the way in which Vasquez was performing his job. Vasquez was a loader for the wholesale route trucks. The salesmen complained that he loaded the conveyors too fast, in the wrong sequence, and that he made errors in the quantities of cartons or bottles he loaded. The superintendent named many of the route salesmen and specified some of the complaints. The working foreman in the shipping department and three route salesmen all testified before the Trial Examiner: They related specific examples of Vasquez's mistakes and referred to a general dissatisfaction with the way Vasquez had been loading the trucks. Vasquez's performance was compared—unfavorably— to that of the other loader in the wholesale shipping department. The General Manager and the General Plant Superintendent testified to having conversed with the Shipping Department Superintendent, three weeks before Vasquez's discharge, on the subject of Vasquez's poor performance. Other than in the testimony of Vasquez himself, who claimed he knew of only a few mistakes

he had made and that the superintendent was picking on him, no evidence can be found in the record to contradict that related above concerning Vasquez's poor performance in the three months preceding his discharge.[13]

### III.

A final issue arises from the failure of the counsel for the Board's General Counsel to produce affidavits of two employees who testified at the hearing, a violation of the Board's own Rules and Regulations, 29 C.F.R. 102.118. Leo Adame testified before the Trial Examiner as to facts relating to Vasquez's discharge. At the conclusion of his direct examination, counsel for Borden requested that counsel for the General Counsel produce Adame's pretrial affidavits and statements. One such statement was produced. However, during cross-examination it was learned that Adame had signed two affidavits; the second related to Adame's own discharge and "to union activities at the plant". The request for production of this affidavit was refused by the Board's counsel and Borden's motion to strike Adame's testimony was denied by the Trial Examiner.

Ray Gonzales also testified in this case, and his testimony related to the 8(a) (1) violation. He had also signed an affidavit in a related case involving The Borden Company, but that fact was

12. E. g., N.L.R.B. v. Whitfield Pickle Co., 5 Cir., 1967, 374 F.2d 576; N.L.R.B. v. Moor Dry Kiln Co., 5 Cir. 1963, 320 F.2d 30. An example of this shifting of the burden of proof by the trial examiner appears in this opinion:

Of the nine route salesmen who were named by either Flores or Bonnemaison as complaining about Vasquez it would have been of particular interest to have heard Joe Clark, who had reported that Vasquez had invited him to a union meeting, and then had furnished the immediate occasion for Vasquez' discharge. But the respondent called only three of the nine route salesmen to testify about Vasquez' alleged mistakes.

\* \* \*

Borden suggests, and the record bears witness in part, that the trial examiner

considered the testimony of the route salesmen to be cumulative and cut off Borden after three had testified. Furthermore, the testimony of Flores, Bonnemaison, and the three route salesmen Wiley, Cuny, and Caldwell concerning Vasquez' mistakes went unrefuted except in general terms by Vasquez.

13. The Board introduced evidence that Vasquez had received various merit pay raises—which appear to have been automatic—and a commendation—which was entirely unrelated to his performance on the job. Thus it develops that Vasquez's testimony stands absolutely alone in the Board's effort to prove Borden's general satisfaction with his performance.

not revealed in the course of the hearing in the instant case, nor did Borden's counsel learn of it until some four months later. Borden filed a motion with the Board to strike Gonzales's testimony or to remand the proceedings to the Trial Examiner because of the non-production of this affidavit; the Board apparently denied this motion.

It is true that under the Jencks Act, 18 U.S.C. § 3500, a witness' statements in the possession of the Government must be turned over to the proper demanding party only where they relate to the subject matter of the witness' direct testimony. See Palermo v. United States, 1959, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287.[14] This case, however, involves not the Jencks Act but 29 C.F.R. § 102.118, which provides:

> No regional director * * * attorney, * * * general counsel, member of the Board, or other officer or employee of the Board shall produce or present any files, documents, reports, memoranda or records of the Board * * * in * * * any cause pending in any court or before the Board * * * *Provided*, After a witness called by the general counsel has testified in a hearing upon a complaint under Section 10(c) of the act, the respondent may move for the production of any statement of such witness in the possession of the general counsel * * * such motion shall be granted by the trial examiner. If the general counsel declines to furnish the statement, the testimony of the witness shall be stricken.[15]

We read this section without gloss: it means what it says.[16]

Because we deny enforcement of the Board's order as it relates to Vasquez's discharge, Adame's testimony becomes irrelevant anyway. But we do note that we enforce the Board's order regarding Borden's 8(a) (1) violation based on the record as a whole *with the testimony of Gonzales stricken.* Under the clear meaning of Section 102.118, we refuse to consider *in camera* the relevancy of Gonzales's affidavit to his testimony or to the instant case in general; so should the Board, the trial examiner, and even the counsel for the General Counsel refuse to defer to an *ex parte* determination of relevancy.

Enforcement of the Board's order is granted in part and denied in part.

---

14. The Jencks Act provides that "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement * * * of the witness in the possession of the United States *which relates to the subject matter as to which the witness has testified*." 18 U.S.C. § 3500(b) (emphasis added).
   As will be seen, the Labor Regulations contain no such conditional modifier as is above italicized.

15. A brief history of this section can be found in N.L.R.B. v. Safway Steel Scaffolds Co., 5 Cir. 1967, 383 F.2d 273, 278.

16. See the excellent discussion of the application of § 102.118 in Harvey Aluminum, Inc. v. N.L.R.B., 9 Cir. 1964, 335 F.2d 749, where the Court in fact *expands* the scope of the proviso to that section.