**CRAMCO, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 24461.

United States Court of Appeals
Fifth Circuit.

July 22, 1968.

William J. Threadgill, Taylor B.
Smith, of Threadgill & Hicks, Columbus,
Miss., for petitioner.

1

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allen J. Berk, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Paul J. Spielberg, Attys., N.L.R.B., for respondent.

Before COLEMAN and GOLDBERG, Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

Once again in the process of unremitting regularity we are called upon to pass upon a labor-management contretemps. The battleground is familiar: to-wit, warnings and discharges allegedly in violation of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act. 29 U.S.C. §§ 158(a) (1) and 158(a) (3). Our statutory and decisional principles have not changed; only each case brings to the arena new armored principals.

In this case, as in scores of others, the disputants deploy facts, inferences, and circumstances to convince us that there are no tactical weaknesses in their respective positions. In brief, the Board found that the company violated Section 8(a) (1) of the Act by coercively interrogating employee Ivy C. Tubb about his union activities and by threatening to discharge Tubb and other union supporters. The Board further found that the company discharged employees Tubb and James C. Jones because of their organizational activities in violation of Sections 8(a) (3) and 8(a) (1). The company argues that its actions against both Tubb and Jones were motivated by valid business reasons, unrelated to its reluctance to embrace the union. Faced with polar interpretations of the company's actions regarding Tubb and Jones, we seek motives and intentions, always elusive concepts in industrial war.[1]

I.

The Board's conclusions as to Ivy Tubb are clearly supported by substantial evidence. Tubb commenced work for Cramco in September, 1965. In the latter part of February, 1966, he began soliciting for the union during lunch, smoke, and restroom breaks. No company reaction and no reports of work interference occurred during the first week of Tubb's union activities. However, on March 1 Tubb informed night superintendent Ray Posthumus of his solicitation, and during the next three days Tubb was subjected to a barrage of threats and disciplinary restraints.

On March 2 Posthumus and personnel manager Jack Jones[2] approached Tubb and threatened him with "automatic discharge" if he solicited for the union on company time. Later that day Posthumus informed Tubb that because he had been soliciting on company time he would have to leave work early and to report to

---

1. Such elusiveness has caused many a judge to empathize with the following expression of skepticism on the "law" of 8(a) (1) and 8(a) (3) violations:

    "There is more than enough scripture to enable any devil to cite some of it for his purpose. We think it quite unnecessary to discuss, much less to try to reconcile, all of the statements made by various judges on the subject, or even all of the statements appearing in the cited cases. The statute commands that we examine the record of each case to ascertain whether the findings of the Board are supported by substantial evidence on the record considered as a whole. This is not always easy, and judges may, and sometimes do, disagree about the result. On its facts, each case is unique." Shattuck Denn Mining Corp. v. NLRB, 9 Cir. 1966, 362 F.2d 466, 469, quoted in Aeronca Manufacturing Co. v. NLRB, 9 Cir. 1967, 385 F. 2d 724, 727.

    On the other hand, Judge Rives' recent scholarly synthesis of the law in NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1968, 398 F.2d 640 [July 1, 1968] demonstrates judicial willingness to meet the legal complexities head-on. For an excellent historical and analytical commentary, see Christensen and Svanoe, "Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality," 77 Yale L.J. 1269 (1968).

2. Personnel manager Jack Jones is not related to James C. Jones, mentioned supra, whose discharge is the subject of part II of this opinion.

Jones the following morning at 10:00 a. m. At 8:00 the following morning Tubb was summoned by Oneal Richardson, his father-in-law, to a meeting at the Pickle Funeral Home (owned by Guy Pickle, who had recommended Tubb for the job with Cramco). At the meeting Richardson, Pickle, and another associate relayed company threats of discharge and blacklisting to Tubb. Shortly thereafter, Jones was called to the meeting, and he substantially corroborated such threats. On Friday, March 4, Tubb went to the plant for his paycheck. When Jones gave him his check, Tubb asked if he had been fired. Jones responded that he "wouldn't say right now," but that Tubb was "under suspension." A week later, after the company had received notice of unfair labor practices charges filed against it by the union, Jones called Richardson and asked him to have Tubb report to work. The following day Tubb was allowed to return to work, but only after he signed a reprimand slip for having "interfer-[ed] with another employee's working during the workday."

■ The company claims that all actions against Tubb were taken pursuant to nondiscriminatory work rules. Although the company's rules are not here challenged by the Board,[3] such rules cannot justify the intensity of disciplinary action taken against Tubb. The company's rule against "Soliciting, distributing or collecting on Company time without permission," required two written notices before the imposition of any penalty (a three-day suspension). To be sure, the company's rule against, "Interferring [sic] with another employee's work during the work day," provided for an immediate three-day layoff. Nevertheless, the Board could properly find from the evidence that actual "interference" had not been shown and that Tubb had been subjected to an "automatic discharge" rather than a mere "three-day layoff."

Escalating rules in the context of union organization is prohibited. We quote from the Fourth Circuit on this point:

"Had Davis and Brethauer been discharged for violating a valid no-solicitation rule designed to further valid production, order and distribution needs, applied without discrimination, their discharge would have been 'for cause' under § 10(c) of the Act and not prohibited by § 8(a) (3). Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B., 330 F.2d 579 (4 Cir. 1964); N.L.R.B. v. Empire Mfg. Corp., 260 F. 2d 528 (4 Cir. 1959). See also, Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Amalgamated Clothing Workers of America, AFL–CIO v. N.L.R.B., 124 U.S.App.D.C. 365, 365 F.2d 898 (1966). But it is well settled that enforcement of an otherwise valid rule only against those engaging in union activities is discriminatory. American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); N.L.R.B. v. Overnite Transp. Co., 308 F.2d 284 (4 Cir. (1962)." NLRB v. Heck's Inc., 4 Cir. 1967, 386 F.2d 317, 319–320.

See also Revere Camera Co. v. NLRB, 7 Cir. 1962, 304 F.2d 162, 165, and NLRB v. Avondale Mills, 5 Cir. 1957, 242 F.2d 669, 671, affirmed sub nom., NLRB v. United Steelworkers of America, 1958, 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383, where Judge Rives, though finding in that case insufficient evidence of discrimination, warned: "An otherwise valid no-solicitation rule, however, cannot be invoked or applied for a discriminatory anti-union purpose."

The company also bemoans the Board's classification of the funeral home meeting as an extension of the company's own anti-union activities. Yet the funeral home convocation and confrontation cannot be explained on any other basis. Tubb was not asked to be a pall bearer

3. See Campbell Soup Co. v. NLRB, 5 Cir. 1967, 380 F.2d 372; NLRB v. Whitfield Pickle Co., 5 Cir., 1967, 374 F.2d 576, 578–579. See also Republic Aluminum Co. v. NLRB, 5 Cir. 1967, 374 F.2d 183; NLRB v. Mock Road Super Duper, Inc., 6 Cir. 1968, 393 F.2d 432, 434–435.

(except at the union's funeral), nor was the discussion meteorological. He was told of imminent discharge and future blacklisting, and was even asked to turn over the signed union authorization cards. The meeting took place at the request of personnel manager Jones, who had called Pickle on March 2 after consulting with both the plant manager and the vice president and general manager of the company. The meeting followed by one day both the overt threats of Posthumus and Jones and Tubb's "suspension" by Posthumus. Soon after the meeting had begun, Jones arrived and continued the discussion with the same tone of reprisal. Clearly, the Board was justified in its finding of coercion on the part of the company, especially in light of Section 2(13) of the Act which proscribes any narrow application of agency principles:

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13).

See also NLRB v. Lake Butler Apparel Co., 5 Cir. 1968, 392 F.2d 76, 79; Furr's, Inc. v. NLRB, 10 Cir. 1967, 381 F.2d 562, 566, cert. den., 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105; Amalgamated Clothing Workers of America, AFL–CIO v. NLRB, 1966, 125 U.S.App.D.C. 275, 371 F.2d 740, 743–744; Colson Corp. v. NLRB, 8 Cir. 1965, 347 F.2d 128, 136–137, cert. den., 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157. We have more than a breath or wisp of suspicion that the March 3 roundtable at the Pickle Funeral Home was formed by, and supplied with the words of, Cramco.

## II.

The case against the company regarding James C. Jones' termination of employment is far more tenuous. Jones began work on March 28, seventeen days after Tubb had been reinstated. A couple of days later working foreman George Sargent warned Jones that if he wanted to keep his job he had better not have anything to do with the union. Nevertheless, on May 3, after discussions with Ivy Tubb Jones signed a union card. Between May 3 and May 13 he gave out similar union cards to three fellow employees. On May 11 or 12 working foreman Sargent told employee Wigginton that Jones was to be laid off because of his union activities. The word spread to Jones, and on May 13 he questioned night superintendent Posthumus concerning his work status. Posthumus told Jones that he was being laid off temporarily because of a production cutback, but Posthumus insisted that such layoff had nothing to do with the union. Jones replied that he would "just quit now," and although scheduled to work the rest of the night, he punched out immediately.

The Board relies, generally, on the company's anti-union history, its failure to lay off any employee other than Jones, and its failure to reinstate Jones at a future date. It relies, specifically, on the two anti-union statements of Sargent as relayed by Jones and Wigginton. The company disavows Sargent's supposed statements and counters the Board's general arguments with evidence of a general decline in business, the undisputed fact that Jones was the lowest employee on the seniority scale, and the credible argument that Jones was not reinstated because he voluntarily resigned. It adds that Jones' meager union activities were never a source of concern and, in fact, were totally unnoticed until asserted by Jones to Posthumus after the layoff decision.

Absent any consideration of the two Sargent episodes, the Board's evidence is too ephemeral and insubstantial to support its finding of violation. See NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1968, 398 F.2d 640 [July 1, 1968]; NLRB v. Great Dane Trailers, Inc., 5 Cir. 1968, 396 F.2d 769 [June 24, 1968]; NLRB v. Borden Co., 5 Cir. 1968, 392 F.2d 412 [March 4, 1968]; Trailmobile Division, Pullman, Inc. v. NLRB, 5 Cir. 1968, 389 F.2d 195; NLRB v. Texas

Industries, Inc., 5 Cir. 1967, 387 F.2d 426; NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197; NLRB v. McGahey, 5 Cir. 1956, 233 F.2d 406, 410–413. "[T]o constitute an 8(a)(3) violation, an improper motive must be a cause without which the employee would not have been discharged." NLRB v. Neuhoff Bros. Packers, Inc., supra, 398 F.2d at 640.

We thus consider the presumptive force of statements uttered by Sargent, acknowledging that if these statements had been uttered by top-level company hierarchy, they would have been sufficient proof of discrimination. NLRB v. Ferguson, 5 Cir. 1958, 257 F.2d 88, 90.

Much has been made by both sides as to the status of Sargent in the company's chain of command. Both sides have attempted to match Sargent's position with that of a statutory "supervisor," and just as the Board has lifted Sargent to the heights of management responsibility and prerogative, so has Sargent's own company made mockery of the title "foreman" which it had bestowed upon him. This line of combat, though not totally irrelevant, does neglect one vital consideration. Sargent is not charged with *doing* anything. In fact, even the Board admits that he could not effect layoffs and discharges (although included in a list of rather innocuous powers the Board, reaching to testimony concerning an analogous position in the company, mentioned that a "working foreman" can effectively *recommend* employee discipline, including layoff and discharge). The evidence regarding Sargent is limited to what he *said*. Proof of discriminatory motives on the part of the company, then, is dependent on the authenticity of Sargent's prognostication to Jones and his report to Wigginton.

In order to convince us that Sargent's words constitute substantial evidence to support its finding, the Board seeks to apply the proposition that "if words attributed to those authorized to speak for management are credited as having been said, their form and content and context eliminate all doubt on motive." NLRB

v. Ferguson, 5 Cir. 1958, 257 F.2d 88–90. Certainly this Court has applied that rule of law in cases such as *Ferguson*, where statements were attributed to both a partner in the company (son of the principal partner) and the general superintendent. Similar holdings can be found in Mel Croan Motors, Inc. v. NLRB, 5 Cir. 1968, 395 F.2d 154 [May 17, 1968] (statements by both the shop foreman and Mel Croan himself); NLRB v. Longhorn Transfer Service, Inc., 5 Cir. 1965, 346 F.2d 1003, 1006 (statements by the company president); NLRB v. Shawnee Industries, Inc., 10 Cir. 1964, 333 F.2d 221, 223–224 (statements by hiring manager, alleged violation in refusal to hire); NLRB v. Globe Products Corp., 4 Cir. 1963, 322 F.2d 694, 696 (statements by the production manager who enforced the dismissals); NLRB v. Ewell Engineering & Contracting Co., 5 Cir. 1963, 315 F.2d 375 (statements by "several representatives of the management"); NLRB v. Linda Jo Shoe Company, 5 Cir. 1962, 307 F.2d 355, 357 (statements by both the foreman and the production superintendent, made to the employee while discharging her); NLRB v. F. Bennett Manufacturing Co., 2 Cir. 1961, 291 F.2d 215 (statements by the company president).

In contrast to such automatic and conclusive indicia of company intent, in NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1967, 375 F.2d 372, 374–375, we were more cautious in attributing discriminatory intent to the company even after crediting reports of discriminatory statements by an admitted supervisor. After holding that "the words spoken—if actually spoken—are enough" to show illegal intent on the part of the supervisor, we continued: "The only question, then, is whether [the supervisor] significantly contributed to the accomplishment of the discharge and if not, whether the person effecting the discharge was shown to have had an adequate awareness of [the union member's] union loyalties and activities." In the case at bar, even if we were to assume Sargent's supervisory status, we would be required

to undergo the same search for a connection between words and deeds as was done in the *Neuhoff* case. And whereas in that case the vocal supervisor was readily connected to the discharge, no such evidential nexus is present here.

In a case likewise involving alleged 8(a) (1) and 8(a) (3) violations due to employee discharge, Judge Brown cogently warns us to weigh with caution a case of discrimination based on second-hand testimony:

"The defect in the Board's conclusion stems directly from the basic weakness in the General Counsel's case. In the final analysis, the evidence of discriminatory discharge comes down to what a couple of employees said supervisor Bailey said he heard the station manager say as to the cause of Oliveria and Hester's discharge.

"We must avoid, of course, the easy temptation to brush all of this aside as hearsay. We have, on numerous occasions, taken pains to point out that when the fact to be proved is a word spoken, it is an uncritical error to protest as to hearsay. The verbal act, as any other act, may be proved by one who heard it, saw it, or felt it. N. L. R. B. v. Ferguson, 5 Cir. 1958, 257 F.2d 88, 90, 92; Hendrix Mfg. Co. v. N. L. R. B., 5 Cir. 1963, 321 F.2d 100, 105; N. L. R. B. v. Globe Prod. Corp., 4 Cir. 1963, 322 F.2d 694, 696; United States v. Gavagan, 5 Cir. 1960, 280 F.2d 319, 329; N. L. R. B. v. Tex-Tan, Inc., 5 Cir. 1963, 318 F.2d 472, 484 n. 31; Huff v. United States, 5 Cir., 1962, 301 F.2d 760; Ward v. United States, 5 Cir., 1961, 296 F.2d 898; Safeway Stores, Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295.

"The inquiry is not the *truth* of the words said, merely whether they were said. And frequently once the trier finds them to have been said, the words themselves carry their own death wound. N. L. R. B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 92.

"But that is not what we have. What we have is: witness A testifies he overheard B state that C said such and such. Obviously A can prove what B said. But the decisive thing is what C is supposed to have said. And A cannot prove what C said by stating what B said C said. And yet, for all practical purposes, that is all we had here since B—Supervisor Bailey—in this barroom after-the-event discourse did not undertake, assuming he had that knowledge or position in the Company hierarchy—to state what he, rather than the station manager (C) had done or said.

"The Board counters with the proposition that B—Supervisor Bailey—did not specifically deny what others attributed to him. That is not the point. He, as would be true of any other witness, could have testified to the verbal act (what the station manager said). But he did not so testify. Rather, a person further removed merely repeated what he said was said.

"Whatever might ultimately be the technical admissibility of proof of this kind, we have no difficulty in concluding that it lacked that substantial quality on which to rest a finding of discriminatory motive in a record as equivocal as this one." General Tire of Miami Beach, Inc. v. NLRB, 5 Cir. 1964, 332 F.2d 58, 60–61.

We realize that our aperture of review is very narrow, stripped as we are of statutory expertise. "If there are two grounds for discharge, one proper and the other unlawful, and the evidence as a whole would make the inferences as to which was the motivating cause reasonably equal, the conclusion reached by the Board should be sustained." NLRB v. Hudson Pulp & Paper Corp., 5 Cir. 1960, 273 F.2d 660, 666; NLRB v. Longhorn Transfer Service, Inc., 5 Cir. 1965, 346 F.2d 1003, 1006; NLRB v. Borden Co., 5 Cir. 1968, 392 F.2d 412, 415 [March 4, 1968]. But this deference to Board expertise does not relieve the General Counsel from proving his case by substantial evidence. Moreover, "the reviewing court must not confine itself to

consideration of evidence 'which when viewed in isolation,' supports the Board's findings, but must also take 'into account contradictory evidence or evidence from which conflicting inferences could be drawn.' * * * 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight * * *.' " NLRB v. Red Topp Cab & Baggage Co., 5 Cir. 1967, 383 F.2d 547, 554 (quoting from Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 478, 487, 488, 71 S.Ct. 456, 95 L.Ed. 456), quoted in NLRB v. The Borden Co., supra. See also Judge Thornberry's analysis in NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197.

The Board's case concerning Jones' termination of employment is not supported by substantial evidence. It is founded instead on imaginative imputations prompted by the words of a petty foreman. We cannot be guided by Sargent's putative ghost-speaking for management.

Enforced in part, denied in part.