UNITED GAS PIPE LINE CO., and Penn-
zoil Pipeline Co., Petitioners-
Cross Respondents,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Cross
Petitioner.

No. 72–1036.

United States Court of Appeals,
Fifth Circuit.

Jan. 11, 1973.

V. R. Burch, Jr., Daniel O. Goforth, Houston, Tex., for petitioners-cross respondents.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C.,

Clifford Potter, Director, Region 23, N. L. R. B., Houston, Tex., Howard Perlstein, Washington, D. C., for respondent-cross petitioner.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

This case arises upon the petition of United Gas Pipe Line Company and Pennzoil Pipeline Company [1] to review and set aside an order issued by the Board on December 10, 1971 and reported in 194 NLRB 131. The Board filed a cross application seeking enforcement of its order. The Board found that the company had violated § 8(a)(1) of the National Labor Relations Act as amended, 29 U.S.C. § 151 et seq. by coercively interrogating employees concerning their union activities and by threatening them with loss of benefits upon the advent of the union.[2] It further found that the company violated § 8(a)(3) and (1) of the Act by refusing to grant the application for a transfer of employee Byron Griffith, because of union activity then in progress. The Board's order directs the company to cease and desist from interrogating its employees concerning their union preferences and threatening them with a possible loss of benefits in the event of union recognition. Affirmatively, the order requires the company to offer Byron Griffith an immediate transfer to the job he sought, displacing if necessary, any employee presently assigned to or working in that position. We enforce the Board's order as to the § 8(a)(1) violation, but find a lack of substantial evidence to support its conclusion that Griffith was denied a transfer in violation of § 8(a)(3). Enforcement is granted in part and denied in part.

I

After several unsuccessful efforts to organize the employees at various company locations, the union renewed its organizational efforts once again in August 1970. Its campaign focused on the employees of divisions of the company located at Shreveport, Louisiana and Victoria, Texas. Pursuant to a representation petition filed by the union on February 16, 1971 an election was held the following May. The union lost the election.

■ We set forth very briefly the details of several incidents which occurred during the course of the union's campaign upon which the 8(a)(1) violation was found. The record discloses substantial evidence to establish that (1) at a meeting to discuss a claim arising from a work injury, a company representative stated to the employee involved that he was known as a "union man"; (2) a plant superintendent made inquiry of an active union employee as to the time and place of a planned union meeting, the subject matter to be discussed and whether he would be permitted to attend; (3) a company representative asked a job applicant whether he favored the union and expressed the opinion that the company would be in a better position if the union were rejected; and (4) at two safety meetings company officials advised employees that union recognition would have an adverse effect upon existing company policy relating to leave and transfer benefits.

We have examined the company's conduct in the circumstances surrounding each event in question. Perhaps the most significant circumstance is the fact that the campaign for union recognition was in progress at the time. Although the company stoutly maintains its inno-

1. United Gas Pipé Line Company and Pennzoil Pipeline Company (hereinafter referred to collectively as the "company") are Delaware Corporations maintaining their principal offices in Houston, Texas. Both corporations engage in the interstate and intrastate transmission of gas and are affiliated businesses with common officers, ownership, direction and operation. The Trial Examiner concluded that they constituted a single, integrated business enterprise.

2. Oil, Chemical and Atomic Workers International Union, AFL–CIO.

cence, it is clearly apparent from the record that the above mentioned evidence, considered in the context of the factual situation as it existed at the time, reasonably supports the inference that such conduct tended to coerce the employees in the exercise of their rights guaranteed by the Act.[3] Accordingly, we affirm the Board's determination that the company violated § 8(a)(1) and that its order based upon that violation should be enforced.

## II

Prior to January 1970, Griffith had 21 years of service with the company at the Carthage, Texas installation. Due to operational changes at Carthage, Griffith and thirteen others were declared to be surplus employees, and he was transferred to the company's installation at Lafayette, Louisiana, approximately 350 miles from Carthage.[4] Griffith's new assignment carried the same pay and grade as his former position[5] and under company rules his change in positions was classified as a lateral transfer as distinguished from a promotion.

Griffith remained in Lafayette for a short time. On April 29, 1970 he accepted a promotion and moved to his new assignment at Goodrich, Texas, which is considerably nearer to Carthage than Lafayette. His desire to return to his former home and business interests continued and he persisted in his efforts to obtain a transfer back to Carthage. Finally, an apparent opportunity arose. A Carthage employee whose duties were classified at the same level as Griffith's became terminally ill and that job was soon to become vacant. Griffith sought a transfer to that position.

His initial inquiry was made of Mr. James Neal, his superior at Goodrich, in early August 1970. Neal expressed doubt over the possibility of a transfer. According to Griffith's undisputed testimony Neal's opinion was based on the following transfer rules set forth in the Company's Personnel Policy Manual:

4.4 Transfers requested by the employee . . . will ordinarily be approved if the employee is performing his present job satisfactorily and has been in his present job and present location for a minimum of one year. The one-year time limit may be waived in exceptional cases and will be waived in cases where the employee entered his present job and location due to a surplus move.

4.41 When a vacancy occurs that would allow consideration of an approved request for a transfer at the employee's expense, a list of employees qualified to be promoted to fill the vacancy shall be developed, and the em-

---

3. See N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547, 580 (1969) (threatened loss of benefits, threats of reprisal) ; N.L.R.B. v. Deutsch Metal Components Division, 445 F.2d 902 (9th Cir. 1971) (interrogation) ; N.L.R.B. v. Universal Cigar Corp., 425 F.2d 867 (5th Cir. 1970) (interrogation) ; N.L.R.B. v. Varo, Inc., 425 F.2d 293, 297–298 (5th Cir. 1970) (interrogation, promise of benefits, threats of reprisal) ; N.L.R.B. v. Atkins Saw Division of Nicholson File Co., 399 F.2d 907, 910 (5th Cir. 1968) (interrogation, union surveillance) ; N.L.R.B. v. Borden Co., 392 F.2d 412 (5th Cir. 1968) (interrogation, threatened loss of benefits, union surveillance).

4. This transfer caused Griffith some degree of personal hardship. A resident of Carthage for over 25 years, he owns substantial acreage there on which he raises chickens commercially, maintains 150 head of cattle and oversees his timberland. In his absence, Griffith's son has managed his farm and business interests.

5. Griffith raised the contention, without developing it fully, that the company did not properly credit him for work he had done during 1966 and 1967 in a grade classification higher than the one he held when he was surplused away from Carthage in 1970. He argues that had the work credit been given, he would have been eligible to remain at Carthage. The company disputed this argument on the ground that its records did not substantiate it.

ployee requesting the transfer shall be placed on the list in accordance with his Service-in-Occupation at the level from which the promotion would be made. The vacancy will then be offered to the qualified employees in the order of their Service-in-Occupation. 4.42 Requests for transfer approved under 4.4 shall be cancelled when an employee accepts a promotion or voluntarily accepts a transfer that is not made for the convenience of the company.

In September 1970, approximately a month later, Griffith discussed the desired transfer with Mr. James Norris, the district operating superintendent at Tyler, Texas. He informed Norris that a position was to open in Carthage in the near future and that he desired to transfer to it. He outlined the background of his employment and his desire to return to his former home and business interests.[6] Just as Neal had done earlier, Norris pointed out the difficulty in view of the one year waiting period required by the company's rule but expressed a sympathetic interest in Griffith's request. Norris suggested that Griffith submit a letter requesting the transfer.

In accordance with the suggestion of Norris, Griffith submitted a letter to Neal requesting the transfer. Neal approved the request and forwarded it to his superiors with the following notation: "Please help this man as he is a very good hand." The request was approved perfunctorily by two of Neal's superiors, one of whom reported directly to company Vice-President J. H. Etcherhoff. The letter resulted in the exchange of interoffice memoranda in which several executives on the intermediate level recommended approval of the transfer but acknowledged the barrier posed by the one year rule.

Finally in October 1970 a meeting was held by several company officials to dis-

cuss the matter. After considering factors for and against granting the transfer, Vice-President Etcherhoff concluded that the company could not justify a departure from well established company policy regarding transfers. The request was denied. The record indicates that none of those present at the meeting to discuss the transfer, including Etcherhoff, knew anything about Griffith's union sentiments one way or the other.

During the time when company officials were considering the request, Griffith received assurances from Norris that he would soon be going to Carthage. After his conversation with Norris, Griffith began making arrangements to move his family. However, before actually moving he discussed the matter further with Joe Harris, a division employee relations representative. Harris indicated clearly his understanding that the requested transfer was still under consideration and expressed doubts about its final approval in view of the company's rule.

On October 26, 1970 Norris informed Griffith of Etcherhoff's decision to deny the transfer. According to Griffith's testimony Norris suggested that the reason for the denial of the transfer was the fact that union activity was taking place at the time and his further belief that if the transfer were approved, the position of the union would be enhanced. Norris vehemently denied making such statements.

The final episode connected with the requested transfer occurred at a safety meeting on November 9, 1970. At that time Norris and Harris met with the Goodrich employees to discuss certain local problems. Two employees raised questions about transfers and Norris is said to have stated that Griffith did not obtain the transfer because of union activity.[7] Griffith further testified that after the meeting Norris elaborated further on his earlier comments and ex-

---

6. See note 4 *supra*.

7. Griffith's testimony to this effect was corroborated by the testimony of a fellow employee at Goodrich, Mr. Clyde Jordan.

pressed the opinion that the union was the cause of the denial of the transfer because "[Management] could do just as they damn pleased if it weren't for the union."

In the meantime the Carthage position sought by Griffith was given to Jesse Edge, another employee. The company presented evidence to show that under the company's rules and policy the position at Carthage was required to be filled on a seniority basis. Employee Edge had greater seniority than Griffith and therefore, even if Griffith's request had been considered as an exceptional case, Edge was entitled to the transfer. It is undisputed that Griffith was not at the head of the eligibility list based on seniority.

After an extensive review of the testimony and exhibits, the trial examiner summarized his assessment of the evidence and the credibility of the key witnesses. He concluded that direct evidence of a purpose to violate the statute is rarely obtainable but must be established by circumstantial evidence. From the statement of some of the supervisors and their recommendation to grant the transfer, the examiner concluded that Vice-President Etcherhoff's decision was motivated by Griffith's union activity. He emphasized that deviations from company policy had occurred in the past, that provision was made in the rules for exceptions to the transfer requirements, and that opposition to the transfer arose in that department of the company which handled labor relations. In addition, he discredited the testimony of company officials that any encouragement which was given to Griffith was always qualified by the statement that his request would have to be granted as an exception to "company policy." Finally, the trial examiner concluded that the company had denied Griffith a transfer in violation of § 8(a)(3) be-

cause of the union activity in progress when he made the request. He added that in light of the atmosphere of antipathy toward the union, the company's action served to discourage union membership or activity. The trial examiner's decision was adopted by the Board without modification.

■ We must determine whether there is substantial evidence on the record as a whole to support the finding of an 8(a)(3) violation.[8] Under this limited standard of review we must defer to the expertise of the Board in our evaluation of factual determinations. But deference does not mean abdication and "courts are not obliged to stand aside and rubber stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the Congressional policy underlying a statute." N. L. R. B. v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1964).

The issue as to the 8(a)(3) violation presents a close question. A brief summary of relevant legal principles will place our analysis of the case in proper perspective. In American Shipbuilding Co. v. N. L. R. B., 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855, 863 (1965) the Supreme Court observed that:

"Section 8(a)(3) prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership. Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation."

See also N. L. R. B. v. Hertz Corp., 449 F.2d 711 (5th Cir. 1971); N. L. R. B. v. Brennan's Inc., 366 F.2d 560 (5th Cir. 1966). Two years thereafter, the court

---

8. N.L.R.B. v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839, 849 (1965); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950).

spoke further on the subject of motivation in 8(a)(3) cases:

"[I]f it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations . . . [I]f the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight' an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial justification for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him."

N. L. R. B. v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L. Ed.2d 1027, 1035 (1967).

■ We must resolve the question whether the company discriminated against Griffith in violation of 8(a)(3) by refusing his requested transfer to Carthage. We conclude that it did not. In our judgment the evidence fails completely to establish that the denial of Griffith's transfer was inspired by or resulted from any antiunion motivation on the part of the company.

Perhaps the most persuasive evidence in support of the Board's decision are the statements alleged to have been made by Norris as to why the transfer was denied. Linking this with other items of evidence, the Board found antiunion motivation. We disagree. Standing alone the evidence relied upon by the Board provides tenuous support at best for the conclusion that the company used its 20-year old transfer policy as a subterfuge to conceal its true motives in dealing with Griffith. The deficiencies in the decision become even more evident when viewed in the light of the record as a whole. The Board was much too restrictive in its view of the evidence and overlooked or ignored evidence of strong probative value which was inconsistent with its theory of the case.

■ Although the Board held that denial of the transfer would discourage union activity, it offered no suggestions as to how this would occur. It did not find that Griffith was an active union member or supporter. The record is similarly void of evidence that either Etcherhoff or other officials acted from improper motives. The evidence is clear that the company considered Griffith's transfer request with the intention of carrying out the company's established policy. Although Etcherhoff admitted that exceptions had been made in the past, the evidence also showed that none of the exceptions occurred in circumstances similar to those involved here. Finally, we are unable to conclude that mere knowledge of union activity on the part of some supervisory personnel could have so tainted the company's decision that an 8(a)(3) violation resulted. It is well settled that the coincidence of union activity and a change in an employee's work conditions does not automatically give rise to a violation of § 8(a)(3).[9]

In the absence of direct evidence of the company's motives, the Board relies heavily on the fact that Norris was in a position to learn of the true basis of

9. See generally N.L.R.B. v. Varo, Inc., 425 F.2d 293, 302 (5th Cir. 1970); N.L. R.B. v. Atkins Saw Division of Nicholson File Co., 399 F.2d 907, 912 (5th Cir. 1968); Macy's Missouri-Kansas Division v. N.L.R.B., 389 F.2d 835, 840–841 (8th Cir. 1968).

Vice-President Etcherhoff's decision. It concludes that it is reasonable to infer that the statements made by Norris were based on actual knowledge of the company's intent. We do not agree. The evidence demonstrates overwhelmingly that Norris was not privy to Etcherhoff's reasoning and decision to deny the transfer. The lack of such information on the part of Norris is well illustrated by two contrasting episodes. Shortly before Etcherhoff made his final decision, Norris expressed the opinion to Griffith that he would receive the transfer and suggested that he go ahead with plans to move. The very next day, however, the assurances of Norris were cast in doubt when Joe Harris informed Griffith that his request was still under advisement and reminded him of the adage "There is many a slip between the cup and the lip." In these circumstances the explanation given by Norris for the company's denial appears to be an expression of individual opinion. It does not appear to be the result of reliable, management-level information, but rather a face saving device to divert the keenly disappointed and unfortunately misled Griffith.

Moreover, we cannot accept the Board's conclusion that the company's transfer policy was a mere subterfuge used as a shield to conceal the actual reasons for denying the transfer. To buttress its conclusion the Board asserts that "no one anticipated limitations of company policy or rules" upon the request. We are unable to accept the Board's rejection of company policy; the evidence amply supports the conclusion that the transfer policy was enforced exactly as it was written. The policy was a valid one and had been in

force for a number of years. The fact that several of Griffith's supervisors supported and even expected approval of his transfer does not detract from our conclusion. Griffith knew of the requirement of the one year waiting period and conceded on cross-examination that both Neal and Norris explained the rule when they discussed his request with him. In two of the interoffice memoranda mentioned above, both of which recommended favorable action on Griffith's request, specific reference was made to the short period of time that Griffith had served at Goodrich. The evidence clearly establishes that those who dealt with the transfer request knew it would not be granted unless the one year rule was waived. We cannot agree with the Board's finding that the transfer policy was a subterfuge.

Indeed far from being a subterfuge, the transfer policy was followed by the company in this very case. The record convincingly demonstrates that even if the one year rule had been waived in Griffith's case, he still would not have been transferred because of his relative seniority standing. Employee Edge who was transferred to Carthage was unquestionably senior to Griffith. Like Griffith he was moved from Carthage for the same reason Griffith was moved in January of 1970.

Even though we are reluctant to disturb the findings of the Board, we are unable to find substantial evidence to support the conclusion that the company violated § 8(a)(3). Although case by case comparisons have limited utility in this field of the law, we must observe that in the 8(a)(3) transfer cases we have examined,[10] the discriminatory im-

---

10. *See, e. g.,* N.L.R.B. v. Monroe Auto Equipment Co., 420 F.2d 861 (5th Cir. 1969); Food Store Employee Union, Local 347 v. N.L.R.B., 135 U.S.App.D.C. 341, 418 F.2d 1177 (1969); N.L.R.B. v. White Superior Division, 404 F.2d 1100 (6th Cir. 1968). A case very much in point is Winchester Spinning Corp., 168 N.L.R.B. 411 (1967). In *Winchester*, the company refused to grant two employees transfers to a particular department on the ground that a seasonal decline in business would soon reduce the work available there and because all vacancies, when they occurred, were filled on the basis of intradepartmental seniori-

pact of the employer's action and the antiunion motivation behind them appear far more firmly established than in the instant case. We are convinced that Griffith was treated fairly and impartially. His disappointment presents a sympathetic appeal and is understandable in light of the misguided assurances of Norris. Nevertheless, the statements by Norris with little else to corroborate them cannot serve as a basis to support a finding of improper motivation on the part of the company which the great weight of the evidence indicates was not present. Furthermore, at a time when union activity had increased and the purpose of the Act to foster industrial peace was in jeopardy,[11] it seems unquestionable to us that the company took the wise and proper course. To have suddenly ignored its long-standing transfer policy would have created a far stronger impression of favoritism and arbitrary action in the minds of its employees than that created by adhering to well-established and well known company rules and policy. Such disregard of its own rules in order to grant the request of Griffith would have placed the company in a most difficult position in explaining to employee Edge why Griffith was transferred in preference to him. Accordingly, we enforce the order of the Board insofar as it relates to the 8(a)(1) violation but deny enforcement of the order which relates to the 8(a)(3) violation.

Enforced in part and enforcement denied in part.

---

ty. The Trial Examiner, believing the Company's reasons to be a pretext, found a § 8(a)(3) violation. The Board reversed even though one supervisor had told an employee that the transfers were ruled out *"on account of the union"* (emphasis supplied). The Board rejected the sinister meaning given to that phrase by the Trial Examiner and found that the Company adhered to its established seniority rules in order to avoid the appearance of discrimination either for or against the union.

11. Brooks v. N.L.R.B., 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125, 134 (1954); Jones & McKnight, Inc. v. N.L.R.B., 445 F.2d 97, 103 (7th Cir. 1971).